[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-12515

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 16, 2007
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-01117-CV-J-32-MMH

WILLIE MATHEWS,

Plaintiff-Appellant,

versus

JAMES V. CROSBY, JR.,
TIM GIEBEIG,
SGT. HALL,
SGT. CROCKETT,
C.O. YOUNG, in their individual capacities,
et al.,

Defendants-Appellees.

C.O. DOBSON, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(March 16, 2007)**

Before TJOFLAT, BARKETT, and GOODWIN,[*] Circuit Judges.

BARKETT, Circuit Judge:

Willie Mathews appeals the grant of summary judgment in favor of James V. Crosby, former warden at Florida State Prison ("FSP"),[1] and Tim Giebeig, former inspector at FSP, on the grounds that they were immune from suit on the basis of qualified immunity. Mathews also appeals the district court's order granting costs and the amount of those costs to Crosby, Giebeig, and other FSP employees who were voluntarily dismissed before trial.[2]

While Crosby was the warden of FSP, Mathews was transferred to FSP and housed on X-wing, where inmates with the most serious disciplinary problems were assigned. Mathews sued Crosby, Giebeig, and several other FSP employees, alleging, inter alia, that they violated his Eighth and Fourteenth Amendment rights by subjecting him to a series of attacks in which excessive and unjustified force was used, resulting in serious injury, including a broken jaw. Mathews alleged that prison guards repeatedly beat him, and that Crosby knew about the general

---

[*] Honorable Alfred T. Goodwin, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1] FSP is a Florida state maximum security facility.

[2] Specifically, Mathews appeals the following cost judgments: $11,333.00 to Crosby and Giebeig; $4,619.40 to James Poston; $6,780.29 to Timothy Thornton, Sgt. Sauls, C.O. Beck, and Charles Brown; and $10,448.59 to Sgt. Hall, C.O. Riner, C.O. Dent, Sgt. Davidson, C.O. Young, Sgt. Crockett, and Steve Dobbs.

propensity for violence against inmates at FSP – especially by certain corrections officers who were involved in the beatings of Mathews – but that Crosby was deliberately indifferent to the risk of abuse and deliberately indifferent to Mathews' serious medical needs. Crosby and Giebeig moved for summary judgment, and the district court granted it, finding they could not be held liable for their acts as supervisory officials. For the following reasons, we reverse the district court's order granting summary judgment to Crosby, affirm the district court's order granting summary judgement to Giebeig,[3] affirm the district court's order granting costs to all defendants, except Crosby and Giebeig, and remand for further proceedings consistent with this opinion.

## STANDARD OF REVIEW

We review <u>de novo</u> a district court's ruling on summary judgment, applying the same legal standards as the district court. <u>Skrtich v. Thornton</u>, 280 F.3d 1295, 1299 (11th Cir. 2002). Summary judgment is appropriate only when the evidence before the court demonstrates that "there is no genuine issue of material fact and

---

[3] Mathews' brief fails to set forth any arguments as to how, if at all, the district court erred by granting summary judgment to Giebeig. Mathews names Giebeig in two point headings, but does not direct any of his argument to Giebeig, and only a peripheral part of his factual analysis to Giebeig. Accordingly, we find that he has waived his claims on appeal against Giebeig. <u>See</u> <u>Greenbriar, Ltd. v. City of Alabaster</u>, 881 F.2d 1570, 1573 n. 6 (11th Cir. 1989) (stating that passing references to issues are insufficient to raise a claim for appeal, and such issues are deemed abandoned (citing <u>Tedder v. F.M.C. Corp.</u>, 590 F.2d 115, 117 (5th Cir. 1979); <u>Davis v. Hill Engineering, Inc.</u>, 549 F.2d 314, 324 (5th Cir. 1977))).

that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party. Skrtich, 280 F.3d at 1299 (citing Augusta Iron and Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988)). That is, courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and "when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's version." Evans v. Stephens, 407 F.3d 1272, 1278 (11th Cir. 2005) (emphasis omitted). Even though the "'facts,' as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case," Priester v. City of Riviera Beach, 208 F.3d 919, 925 n.3 (11th Cir. 2000), our analysis for purposes of summary judgment must begin with a description of the facts in the light most favorable to the plaintiff, Skrtich, 280 F.3d at 1299.

## DISCUSSION

As we have often stated, "[q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Lee v. Ferraro, 284 F.3d 1188, 1193-94 (11th Cir. 2002) (internal citations and quotation marks omitted). In order to

4

receive the protection of qualified immunity, the government official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred. Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004) (citing Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002)).[4]

Once eligibility for qualified immunity is established, the burden shifts to the plaintiff to show that qualified immunity is not appropriate. Lee, 284 F.3d at 1194. This step consists of a two-part inquiry, set forth in Saucier v. Katz, 533 U.S. 194 (2001). First, we ask, "do the facts alleged show the government official's conduct violated a constitutional right?" Id. at 201. If a constitutional violation is established, based on the facts in the light most favorable to the plaintiff, we then must determine whether such conduct would have violated federal law that was clearly established at the time of the incident. Garrett v. Athens-Clarke County, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing Saucier, 533 U.S. at 201-02).

**I. Constitutional Claims**

We first address the question of whether Crosby violated Mathews' Eighth Amendment right to be free from cruel and unusual punishment. "The

---

[4] There is no question in this case that Crosby was acting within the scope of his discretionary authority as warden of FSP.

Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones, and it is now settled that the treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." Farmer v. Brennan, 511 U.S. 825, 832 (1994) (citations and quotation marks omitted). "In its prohibition of 'cruel and unusual punishments,' the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive physical force against prisoners." Id. "Being violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." Id. at 833 (citations and quotation marks omitted).

We have held that supervisors can be held liable for subordinates' constitutional violations on the basis of supervisory liability under 42 U.S.C. § 1983. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003). Supervisory liability under § 1983 occurs "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." Id. The question before us on appeal is whether there was a causal connection between Crosby's actions or inaction and the beatings suffered by Mathews.

A causal connection may be established when: 1) a "history of widespread abuse" puts the responsible supervisor on notice of the need to correct the alleged

6

deprivation, and he or she fails to do so; 2) a supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so. Cottone v. Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003).

Therefore, we next examine whether the district court erred in concluding that insufficient facts were presented to support liability against Crosby through a causal connection between his actions and the alleged constitutional deprivation committed by Crosby's subordinates.

## A.

The facts, construed in the light most favorable to Mathews, the nonmoving party, are as follows. Willie Mathews arrived at FSP on July 4, 1999, along with four other inmates from Hamilton Correctional Institution following an incident in which they were accused of assaulting two correctional officers. At FSP, Mathews was placed in isolation on X-wing. On or about July 4, 5, and 10, Mathews claims he was beaten by corrections officers because of the incident at Hamilton. He claims that on or about July 12, 1999, his mother called warden Crosby to inform him that she had received a letter from an officer working at the prison, stating that her son was in danger and was being abused by prison guards. The same day,

7

Mathews was visited by Giebeig, the on-site inspector at FSP. Mathews told Giebeig that he had been repeatedly beaten. Mathews was seen by a doctor, but no other action was taken to protect Mathews from further beatings or to determine the validity of the allegations.

Giebeig testified that he "had conversations with [Crosby] every day on everything going on at FSP" and that therefore the inspector was "almost positive" that by July 13, 1999, Crosby was aware of Mathews' allegations that he was being repeatedly attacked. The inspector later testified that he was "sure somewhere between the 13th and the . . . 16th" of July 1999, he "spoke with [Crosby] . . . concerning the Mathews allegations."

On July 15, 1999, Mathews filed an emergency grievance stating that he was in fear for his life and was suffering from an untreated broken jaw following repeated assaults by prison guards on X-wing. Mathews urged authorities to send someone to remove him from X-wing "before [he is] killed." By July 16, 1999, Giebeig was advised by dental staff that Mathews had a fractured jaw. Giebeig claims he reported this information to the acting warden, A.D. Thornton. FSP had procedures which required officers to document any use of force against inmates on an official use of force form. Copies of the use of force forms were forwarded to the warden. No use of force forms were completed in this case to explain the

8

cause of Mathews' injury.

On July 17, 1999, another inmate, Frank Valdes, housed on X-wing, was repeatedly beaten and killed by several officers, including Timothy Thornton, one of the defendants in this case.[5] Only after that incident was Mathews transferred from FSP and surgery was performed on his fractured jaw. Based on these facts, we are satisfied that a jury could find that guards at FSP committed a constitutional violation and thus, we turn to the issue of whether Crosby can be held liable as a supervisor for that constitutional violation.

**B.**

Construed in the light most favorable to Mathews, the nonmoving party, the facts pertaining to whether Crosby was put on notice by a history of widespread abuse at FSP, or whether he had established customs or policies resulting in deliberate indifference to a prisoner's constitutional rights, reflect the following.[6] Crosby was preceded as warden of FSP by Ron McAndrew.[7] Warden McAndrew testified that when Crosby succeeded him as FSP warden, the two had several

---

[5] See Valdes v. Crosby, No. 05-13065, ___ F.3d ___ (11th Cir. 2006).

[6] We repeat many of the factual allegations set forth in Valdes, No. 05-13065, ___ F.3d ___, as the depositions we rely on in this case were also submitted in Valdes.

[7] McAndrew testified that he had over twenty years of experience as an officer, sergeant, lieutenant, investigatory, deputy warden, and warden of another Florida state facility before becoming warden of FSP.

phone conversations (Crosby declined McAndrew's invitation to meet in person). In those conversations, McAndrew specifically warned Crosby about certain guards, who McAndrew believed were abusive toward inmates and needed to be kept out of high profile areas, such as X-wing, because "[t]hey were out of hand and [McAndrew] was afraid they would kill an inmate." McAndrew also taped a list of these guards to the center drawer of the warden's desk.

One of the guards that McAndrew testified he specifically warned Crosby about was Timothy Thornton, one of the defendant officers in this case accused of overseeing at least one of the beatings suffered by Mathews. When McAndrew left FSP in February 1998, Timothy Thornton had recently been one of the guards involved when a prisoner was extracted from his cell in X-wing and beaten so severely that the prisoner had to be "airlifted by helicopter to a hospital, where he remained for nine days and was treated for extensive injuries and spent several months recuperating." Skrtich, 280 F.3d at 1300. The inmate's injuries from that incident included "(1) left chest trauma with multiple fractures to the left ribs and left hemopneumothorax, (2) back injury with fractured multiple transverse processes, (3) right scalp laceration, (4) left shoulder and right knee injury, (5) abdominal trauma, and (6) post trauma anemia" Id. The inmate's chest "revealed the presence of an extensive amount of injuries with multiple abrasions and

10

contusions and several markings of shoes on his back and left chest," which markings a doctor found "were probably made from a stomping motion as opposed to merely holding [the inmate] down," "consistent with physical abuse." Id. (internal quotation marks omitted).[8]

McAndrew further testified that he moved Thornton off of X-wing and away from areas where he thought Thornton would have opportunities to abuse inmates. McAndrew testified that shortly after he became warden he wanted to terminate Thornton. McAndrew described Thornton as "an extremely dangerous person. . . . [T]his guy's a walking hand grenade . . . and the pin's pulled." McAndrew specifically told Crosby "this guy is dangerous. . . . You need to get him off the payroll." However, McAndrew only reprimanded Thornton based in part on the advice of two of his subordinates, who advised McAndrew that Crosby (who at the time was the state corrections department Director of Security and Institutional Management), had called them to intervene on Thornton's behalf to ask that he be given every possible consideration. Deputy Warden A.D. Thornton, no relation to Timothy Thornton, similarly testified that both he and McAndrew had concerns about Timothy Thornton. Notwithstanding McAndrew's briefing on Thornton, after Crosby became the FSP warden, Timothy Thornton was promoted to Captain,

---

[8] In Skrtich, we held that the officer defendants were not entitled to qualified immunity for the alleged beating of Skrtich. Skrtich, 280 F.3d 1295.

11

was permitted to work on X-wing, and was personally selected by Crosby to receive preferential staff housing. In his deposition, McAndrew summarized Crosby's approach to Thornton as "[Crosby was] told he has a potential killer on his hands and he promotes the guy from lieutenant to captain."

McAndrew further testified that he asked Crosby to sit with him for a "desk audit" to review all issues and problems McAndrew was passing on to Crosby. He wanted to have the "desk audit" with Crosby because FSP "had a notorious reputation for the beating of inmates" and McAndrew was attempting to address the problem. Crosby, however, said he did not have time or was not interested in meeting for the "desk audit."

A.D. Thornton also testified that Crosby was instrumental in bringing Montrez Lucas to FSP from another correctional institution where he had worked with Crosby. Lucas had been disciplined before being brought to FSP by Crosby. Lucas bragged about how he had been suspended for using excessive force against an inmate but had not been terminated for it. In addition, shortly after Mathews was beaten, Lucas was investigated for teaching correctional officer trainees improper practices in June 1999, prior to the Mathews beating. The Department of Corrections investigation report stated that Lucas taught the following techniques: taking "free shots" at inmates while they were handcuffed, using chemical agents

12

on inmates without the required notice and even after inmates became compliant, reviewing medical reports before completing use-of-force forms to ensure conformity between the two, instructing trainees about which areas of the human body could be kicked without leaving bootprints, and bringing inmates to the medical ward for treatment of minor injuries and then beating the inmates severely after they had been returned to their cells.

McAndrew stated that while he was warden he hired an "assistant warden who was aggressively helping fight the excessive use of force in the prison." McAndrew specifically hired this assistant warden because he believed the assistant warden could be trusted and would actively pursue McAndrew's goals of reducing inmate abuse. When Crosby became warden, he "transfer[red] her out to another prison."

Additionally, evidence was presented that FSP, like most facilities, had procedures for extracting inmates from their cells when they refused to submit to being restrained by handcuffs and leg irons. On X-wing, cell extractions consisted of four or five officers using the physical force necessary to restrain and remove an inmate from his cell. Cell extractions and any other use of force were to be documented by prison officials. Copies of the use-of-force forms were forwarded to the warden.

13

Prior wardens at FSP required officials to videotape cell extractions. Warden McAndrew testified that his predecessor at FSP suggested videotaping cell extractions as a method to cut down on problems during uses of force. McAndrew testified that FSP had a "notorious reputation" as an institution where guards beat the inmates, and he continued videotaping because he felt staff were more likely to act professionally and inmates were less likely to resist the commands of the guards when they knew they were being videotaped. When Crosby became warden, however, he discontinued the practice of videotaping cell extractions. Viewing all facts and inferences in the light most favorable to Mathews, it could be inferred that Crosby's action in discontinuing the use of the cameras once he became warden, despite knowledge that specific FSP officers were suspected of unwarranted assaults upon inmates, sent a message to corrections officers that the administration at FSP was going to permit further abuse of inmates.[9]

Reverend Andrew MacRae, an FSP prison chaplain from 1994 until August 1999, testified about the marked difference in the culture at FSP after Crosby became the warden. MacRae testified that although he never witnessed an inmate being physically abused during any warden's administration, Crosby had a more

---

[9] In a March 25, 1999, meeting of FSP supervisory personnel allegedly attended by Crosby, there was a discussion about the frequency with which certain officers were being accused of abusing inmates and what steps might be taken to remedy the situation.

14

"hands-off" approach than prior wardens had, thus permitting the "good old boys" network of guards to mistreat inmates. MacRae testified that after Crosby became warden, there were occasions when MacRae was prevented from seeing inmates following uses of force – which previously had been a time that he would often offer counsel to those inmates. MacRae was also familiar with the practice of "touching up" an inmate, wherein an inmate would be subjected to minor injuries during an apparently justifiable use of force and then, following corroboration of the injuries by the medical facility, the inmate would be returned to X-wing and beaten. MacRae testified that he believed these instances increased during Crosby's tenure because of Crosby's hands-off approach.

Evidence was also provided regarding the manner in which Crosby handled abuse-of-force complaints from inmates. FSP's procedures relating to prisoners' abuse-of-force complaints required inmates to report an accusation on a grievance form that would then be forwarded to the Inspector General's central office via an on-site prison inspector's report. The central office would review the reports and respond to the on-site prison inspector regarding what further action, if any, should be taken by the inspector. Copies of the inspector's report to the central office and copies of the central office's response would be forwarded to the warden. The central office also would receive inquiries about prison conditions from persons

15

outside the prison, such as an inmate's family or government officials whom an inmate or his family may have contacted. Copies of the documentation of such inquiries and directions about what action would be taken were also forwarded to the warden.

Evidence was submitted that despite having the abuse-of-force complaints and use-of-force forms forwarded to him, Crosby did not read them. Rather, Crosby delegated the responsibility of handling the complaints to his secretary, who had no law enforcement background. In his deposition, McAndrew stated that he had "reasons" to believe that the secretary was obstructing inmate abuse investigations. McAndrew told Crosby about his concerns relating to the secretary. Nonetheless, Crosby delegated the responsibility for reviewing and acting on inmate complaints to the secretary. Nearly all of the inmate-related correspondence set forth below regarding alleged abuse contained notations of an "r" next to Crosby's initials, which Crosby testified indicated that his secretary may have handled the matter without him becoming involved or having specific knowledge of the complaints or the secretary's responses.

Included in the numerous complaints and inquiries sent to Crosby between December 1998 and July 1999 were a reference to an inmate's complaint that he was "being maliciously harassed and threatened by staff" who "threatened to kill"

the inmate and that his efforts to remedy the issue at the institutional level had been "to no avail"; an inmate's complaint that officers were falsifying disciplinary reports against him as a means to keep him in close management confinement; a complaint from an inmate's spouse stating that FSP staff had locked her husband in a stripped cell, were depriving him of food and were "threatening to physically abuse" him; an inmate's letter "concerning drug dealing and physical abuse by staff" which also notes that the Department of Corrections agreed to take steps to ensure that the inmate's safety would not be jeopardized because of his testimony as a witness; an inquiry on behalf of an inmate's family members who were "concerned about the inmate's safety since they allege he was beaten by [a sergeant and] was taken to the hospital for sustained injuries" and had not had contact with him since; an inmate who wrote "alleging fear for [his] life and wishing to file a complaint against four officers" he stated were "trying to kill [him]"; a letter from another inmate who complained of being "harassed and threatened by both staff and other inmates" as a result of his status "as a witness for the State Attorney's Office"; an inquiry on behalf of an inmate who feared for his safety at FSP because he had murdered a corrections officer at another Florida correctional institute more than 15 years earlier; a letter from a death row inmate to the Florida Department of Law Enforcement, asking it to investigate his claims that supervisory staff at FSP

17

failed to investigate allegations that prison officials assigned to death row permitted a violent inmate to be out of his cell without restraints so that he could threaten and intimidate other inmates; letters from several different inmates claiming that corrections officers had threatened to kill them; and a letter on behalf of an inmate discussing allegedly criminal acts committed by various guards, and questioning the need for officers to continue to use force against an inmate once he had already been restrained by handcuffs and shackles.

Mathews produced evidence from which a jury could find that Crosby received copies of all the complaints referenced above concerning the abuse of inmates by guards at FSP, including allegations of abuse of Mathews. Furthermore, Crosby had been specifically warned by his predecessor about certain guards whose abuse of inmates was so severe that the prior warden felt one of them might kill an inmate if not stopped. Crosby, however, did not take steps to neutralize those guards and on at least one occasion sought to give one of the guards preferential treatment in housing. Mathews also presented evidence that Crosby had a reputation for being a "hands-off" warden; regularly delegated responsibility for his office's grievance response management to his secretary; and failed to keep guards with known records of alleged abuse away from assignments near at-risk inmates, such as those on X-wing.

18

This evidence, when taken together, is more than adequate to entitle Mathews to proceed to trial and show that inmate abuse at the hands of guards was not an isolated occurrence, but rather occurred with sufficient regularity as to demonstrate a history of widespread abuse at FSP. The facts presented, if found by a jury, sufficiently support a conclusion that Crosby knew of the widespread abuse and was "on notice of the need to correct or to stop" abuse by officers. Cottone, 326 F.3d at 1362.

The same evidence, again taken together and in the light most favorable to Mathews, is sufficient to allow a jury to consider whether Crosby had established customs and policies that resulted in deliberate indifference to constitutional violations and whether Crosby failed to take reasonable measures to correct the alleged deprivations. Id. at 1360; see Smith v. Brenoettsy, 158 F.3d 908, 912-13 (5th Cir. 1998) (dismissing warden's appeal of denial of summary judgment in light of factual disputes as to warden's knowledge of substantial risk and reasonableness of warden's response where plaintiff, who was stabbed by a prison guard, sent letters to warden complaining of verbal abuse and threats by guard, and warden responded that sheer volume of unsubstantiated complaints made investigation of every complaint unreasonable).[10]

---

[10] Mathews also asserts that he was unconstitutionally denied adequate medical care, and that Crosby is liable for this constitutional violation under his supervisory liability. Mathews

19

## II. Clearly Established Law

Crosby argues that even if Mathews can establish a constitutional violation, Crosby is protected by qualified immunity because Mathews has failed to show that it was clearly established at the time of the beatings that a warden could face liability under § 1983 predicated on his failure to take reasonable steps in the face of a history of widespread abuse or his adoption of custom or policies which resulted in deliberate indifference.  We disagree.  By 1999, it was clearly established that a warden, the person charged with directing the governance, discipline, and policy of the prison and enforcing its orders, rules, and regulations would bear such liability.  See, e.g., LaMarca v. Turner, 995 F.2d 1526, 1539 (11th Cir. 1993) (holding that prison warden could face liability when his failure to take appropriate measures to improve prisoner safety created a climate that preordained the ensuing violence); Fundiller v. City of Cooper City, 777 F.2d 1436, 1443 (11th Cir. 1985) (holding that safety director whose responsibility included disciplining police officers and setting police department policy could be liable for failing to take corrective steps in the face of a pattern of excessive force engaged in by

---

sets forth little, if any, facts relating to a causal connection between Crosby's actions and the alleged constitutional deprivation in the denial of medical care.  All of Mathews' allegations concern the beatings on X-wing and the culture of violence at FSP.  Accordingly, Mathews has failed to allege a claim for § 1983 supervisory relief against Crosby for the denial of medical care.

officers); see also Skrtich, 280 F.3d at 1303 (stating that by 1998 "precedent clearly established that government officials may not use gratuitous force against a prisoner who has been already subdued or, as in this case, incapacitated"); Bruce v. Wade, 537 F.2d 850, 853 (5th Cir. 1976) (a violation of § 1983 is clearly stated by the unjustified beating of an inmate at the hands of prison officials).

### III.  Award of Costs

Initially, because we reverse the summary judgment as to Crosby, we vacate any judgment of costs awarded to him.  On remand, Giebeig may move for costs, consistent with our discussion of indigency below.

As to the other costs awarded, Mathews objects: 1) to any costs, except to those costs awarded to James Poston, because the magistrate judge improperly "assisted" the Defendants by requesting an additional filing; and 2) to the failure of the district court to reduce the amount of costs given that he is indigent.

We reject as meritless Mathews' first argument that the magistrate judge improperly "assisted" the Defendants by allowing them to submit an additional filing to address Mathews' indigency.  Moreover, Mathews failed to file objections to the magistrate judge's order within the ten days required by Federal Rule of Civil Procedure 72(a).  Thus, Mathews failed to timely assert this claim.

As to Mathews' second claim that the costs should be reduced based on his

indigence, we review a district court's decision about whether to award costs to the prevailing party for abuse of discretion.[11]  Chapman v. AI Transp., 229 F.3d 1012, 1023-24 (11th Cir. 2000).  The Defendants, having obtained from Mathews a voluntary dismissal with prejudice, are considered prevailing parties.  See also Sequa Corp. v. Cooper, 245 F.3d 1036, 1037-38 (8th Cir. 2001) (noting that voluntary dismissal without prejudice under Fed. R. Civ. P. 41(a)(1)(i) does not deprive a district court of authority to award costs) (citing Cantrell v. Int'l Bhd. of Elec. Workers, Local 2021, 69 F.3d 456, 458 (10th Cir. 1995) (en banc) (holding that district courts have discretion to award costs when a party dismisses an action, with or without prejudice)).  An abuse of discretion occurs if the trial judge bases an award or denial upon findings of fact that are clearly erroneous.  Mut. Serv. Ins. Co. v. Frit Indus., Inc., 358 F.3d 1312, 1323 (11th Cir. 2004).

Federal Rule of Civil Procedure 54(d)(1) provides that "[e]xcept when express provision therefor is made either in a statute of the United States or in these rules, costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs . . . . "  Fed. R. Civ. P. 54(d)(1). Under Rule 54(d), there is a strong presumption that the prevailing party will be

---

[11] There is no question that Mathews timely filed objections relating to this claim, as the magistrate judge's order was issued on March 10, 2005, and Mathews objected on March 21, 2005, within the ten day limitation.  See Fed. R. Civ. P. 6(a) (Saturdays and Sundays are excluded from computation of time when under eleven days).

22

awarded costs. Arcadian Fertilizer, L.P. v. MPW Indus. Serv., Inc., 249 F.3d 1293, 1296 (11th Cir. 2001). Such costs, however, may not exceed those permitted by 28 U.S.C. § 1920. Maris Distrib. Co. v. Anheuser-Busch, Inc., 302 F.3d 1207, 1225 (11th Cir. 2002). Costs that may be awarded under § 1920 include: "(1) fees of the clerk and marshal; (2) fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) fees and disbursements for printing and witnesses; [and] (4) fees for exemplification and copies of papers necessarily obtained for use in the case." 28 U.S.C. § 1920.

Here, the magistrate judge's report and recommendation went through an extensive analysis of each individual cost under § 1920 and whether Mathews was entitled to a reduction of costs because of his indigence. As we explained in Chapman, a district court needs a "sound basis" to overcome the strong presumption that a prevailing party is entitled to costs. There was none in this case, and the magistrate judge thoroughly considered each cost of the awards individually. Accordingly, we affirm the costs to all parties, except to Crosby and Giebeig as set forth above.

## CONCLUSION

Accordingly, the district court's order granting summary judgment in favor of Crosby is **REVERSED**, and in favor of Giebeig is **AFFIRMED**. The district

23

court's order awarding costs is **REVERSED** to Crosby and Giebeig and

**AFFIRMED** to all other parties.