[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 31, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-10166
Non-Argument Calendar

_____

D. C. Docket No. 06-80064-CR-DMM

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VICTOR CALLES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(March 31, 2008)**

Before BIRCH, MARCUS and WILSON, Circuit Judges.

PER CURIAM:

Victor Calles appeals his convictions for kidnapping, in violation of 18

U.S.C. § 1201(a)(1), and the interstate transportation of a stolen vehicle, in violation of 18 U.S.C. § 2312. On appeal, Calles argues that: (1) the district court erred by denying his motion to suppress post-arrest statements; (2) the evidence was insufficient to support his convictions; and (3) the district court erred by denying his motion for new trial under Federal Rule of Criminal Procedure 33. We find that, because Calles's post-arrest statements were intelligently, knowingly, and voluntarily waived, the district court did not err in denying Calles's motion to suppress his post-arrest statement. We also find that the evidence was sufficient to sustain his convictions, and that the district court did not abuse its discretion by denying Calles's motion for new trial because his brother's recantation of his trial testimony would probably not have produced a different result at a new trial. We AFFIRM.

## I. BACKGROUND

Calles, his brother, Jose Calles ("Jose"), their cousin, Javier Recino Santos, and Joel Muratti-Hani were indicted for kidnapping, in violation of 18 U.S.C. § 1201(a)(1), and the interstate transportation of a stolen vehicle, in violation 18 U.S.C. § 2312. The charges resulted from a complaint filed by Christina Esfandiari. At the time of the conduct at issue in the indictment, Esfandiari was Calles's girlfriend.

2

Before trial, Calles filed two motions to suppress post-arrest statements, confessions, and admissions. In his first motion, Calles argued that his statements were obtained in violation of his Fifth and Sixth Amendment rights because his post-arrest statements were not freely and voluntarily given, and the execution of a written waiver with respect to his rights under Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966) was not voluntary. He argued that any written waiver was not knowingly and intelligently executed because he lacked familiarity with the process and was unable to speak, read or write English and unable to read or write Spanish. Calles also argued that the statements were obtained in violation of the Fourth Amendment as a result of an unlawful arrest. In the second motion, Calles reiterated the arguments made in his first motion, and contended that law enforcement officials used threats and improper influence to obtain the statements. He also argued that the statements should not be admitted under Federal Rule of Evidence 403 and that their admission was not supported by "proof of the corpus delicti of the crime." R1-87 at 4.

In response, the government attached the Spanish waiver-of-rights form that Calles signed and a Federal Bureau of Investigation ("FBI") 302 report, providing that Calles was advised of his rights. The FBI 302 report documented Calles's confession and indicated that he willfully participated in the offenses.

3

The district court held a hearing on the suppression motion. FBI Special Agent Alan Santiago testified that he had been with the FBI for over 18 years and spoke both Spanish and English fluently. After Calles's arrest, Santiago interviewed Calles in a West Palm Beach Police Department ("WPBPD") holding cell, and advised him of his rights using the FBI's standard Spanish advice-of-rights form. Santiago was accompanied by Agent Eric Rivera, who also spoke Spanish. Speaking in Spanish, Santiago identified himself to Calles, explained why he was there, and informed Calles that he had to advise him of his rights before he could speak with him. Santiago held the form so that Calles could see it, slowly read the form out loud in Spanish, and observed Calles to see whether he was comprehending. The form also contained a waiver-of-rights section which provided that a defendant could make statements without an attorney if he read and understood his rights. Calles signed the waiver in the presence of Santiago and Rivera. To ensure that Calles understood his rights, Santiago asked him if he understood his rights, and Calles stated that he did. When Santiago asked Calles about his education, Calles said that he had a third or fourth grade education and could read. At Santiago's request, Calles then read the form aloud and Santiago helped Calles whenever he struggled with the pronunciation or meaning of a word. This process took nearly ten minutes and, after Calles finished reading

4

the form, including the waiver section, he agreed to speak to Santiago and Rivera without an attorney and told them that he wanted to tell them the truth. Calles appeared sad and as if "he wanted to get something off of his chest . . . ." R3 at 13. Santiago did not threaten Calles, did not scream or yell, did not make any promises, and was not wearing his pistol.

Santiago documented the interrogation in the admitted FBI 302 report a few days later. In the report, Santiago explained that Calles informed them that he had willfully participated in the kidnapping and abduction of his fiancé Esfandiari.[1] While making this statement, Calles was calm, remorseful, and sad. Santiago considered the interview to be routine because Calles was willing to provide a statement and never asked for an attorney. The government also called Rivera, who testified consistently with Santiago, including the fact that Calles was informed that he could stop the questioning at any time.

Esfandiari testified that Calles could neither read nor write in English or in Spanish, including writing his own name or reading a restaurant menu, had a second grade education at best, and was embarrassed about his illiteracy. She explained that Calles had to quit a job with a Mexican restaurant because he could not read the orders. Esfandiari, a high school graduate with advanced secretarial

---

[1] Calles and Esfandiari became engaged to be married after his arrest.

training, worked as a secretary for accounting firms. Esfandiari said that, despite communicating with Calles using half Spanish and half English, Calles did not always understand what she said.

The government argued that the testimony of Santiago and Rivera established that Calles voluntarily waived his rights, that Calles was able to communicate with them in Spanish, and that his confession was corroborated by other evidence. Calles argued that Esfandiari's testimony established that his illiteracy prevented him from fully understanding his rights, and that he did not, therefore, make a knowing and voluntary waiver of his Miranda rights. The district court denied the motion to suppress. The court found that

> two experienced FBI agents read his rights to him in Spanish, explained the rights to him, and that he voluntarily and knowingly waived those rights. While he may have limited formal education, the defendant has been able to function in society, apparently has been able to hold several jobs, has had a relationship with an educated woman, and so I don't see any basis for a conclusion that he wasn't able to understand these rights.
>
> These are pretty straightforward and uncomplicated rights, and I see no – there has been no evidence of intimidation or coercion. In fact, the defendant apparently wanted to cooperate. . . .
> . . . .
>
> In any event, from what I guess I've heard both in the Government's argument today and in other proceedings, it appears to me the Government has evidence apart from the statements of Mr. Calles that certainly are sufficient to overcome any suppression issue. I don't see any basis to suppress the statements given the other

6

evidence in the case.

Id. at 50-51.

During the trial, witnesses testified that, on the morning of 17 January 2006, while checking out of their hotel room at the Dollar Inn in West Palm Beach, Florida, they observed a woman, later identified as Esfandiari, run across the hotel parking lot, screaming "help me, help me, they're holding me at knife point" and "call 911." R4 at 107. She ran to the hotel front office and banged on the door, seeking to gain entrance. A few seconds later, two men emerged from the room from which the woman had come and approached her. As the men surrounded her, she wrapped her arms and legs around a railing and one of the men, who was wearing a white shirt, began "yanking" on her neck trying to get her to let go. Id. at 111, 121. She repeatedly yelled, "They're holding me at knife point. Please call the police." Id. at 122. After one of the witnesses, Mark Christ, learned from the hotel owner that he was not going to call the police, Christ asked the woman, still holding onto the railing, what she wanted him to do, and she told him to call the police. Christ then called 911 and a recording of that conversation was played for the jury. Christ also observed that, in addition to the first two men who had emerged from the room and approached the woman, two other men came out of the same room and left the area.

The hotel owner testified that the incident was taped on the hotel's security camera. The video recording was played in court and Christ noted that the hotel owner's wife opened the office door while the woman was banging on it, but was pulled out by the man in the white shirt who grabbed her shirt. At that point, the woman hugged the railing, while one other man tried to pull her legs apart and the man in the white shirt pulled on her neck. Christ's testimony was corroborated by his two co-workers, Michael DeRosiers and Marson Johnson, the hotel owner, and the hotel owner's wife.

WPBPD Officer Regina Bell testified that she was called to the Dollar Inn on 17 January, after Officers Paul Creelman and James Sniffen had detained the two men and Esfandiari. Bell found Esfandiari crying and holding on the railing, and took her off to the side to speak with her. Esfandiari told Bell that her boyfriend, Calles, Jose, and Santos had taken her from her home in Virginia, spent her money, stolen her credit cards and jewelry, held her at knife point, and raped her. Esfandiari's statements regarding the credit cards and jewelry were confirmed when the officers discovered that Calles, who was wearing a white shirt, had Esfandiari's credit cards in his wallet, and that Jose was wearing her jewelry. Esfandiari did not indicate that Calles was a victim, but rather that Calles was responsible for what happened to her.

WPBPD Detective Lori Colombino testified that she was at the police station on 17 January when Calles and Jose were brought in after their arrest. When their belongings were inventoried, a pocket knife and a bank card in Esfandiari's name were found in Calles's possession, and numerous pieces of jewelry were found on Jose. Colombino spoke with Esfandiari for hours after her release from the hospital and Esfandiari never indicated that Calles was a victim or had been threatened to participate. Rather, she confirmed that Calles was the one who had forced her to withdraw money from an ATM machine and who had prevented her from entering the hotel office. Detective David Lefont, who worked with Colombino, testified that he also spoke to Esfandiari and that she never said anything about Calles not being responsible for the incident.

WPBPD Officer Creelman testified that he spoke to Calles, Jose, and Esfandiari when he arrived at the Dollar Inn on 17 January. One of the men told him that Esfandiari was a drug user and was mentally ill, and that they were trying to make sure she was alright. Esfandiari, however, told Creelman that she had been kidnapped from Virginia, brought to Florida against her will, raped, and held at knife point, and that the men had taken her debit card and were forcing her to withdraw money from her account. Creelman searched Calles's wallet and confirmed that he had Esfandiari's bank card. Esfandiari specifically told Officer

9

Creelman that Calles was involved.

Muratti-Hani had pled guilty and testified regarding his involvement in the offense. He explained that Esfandiari had given Calles, Jose, Muratti-Hani, and Santos a ride to a restaurant on 15 January 2006. After Esfandiari got mad and left the restaurant, Calles, Jose, Muratti-Hani, and Santos, who were all drunk, got a ride back to her apartment. Esfandiari arrived home later, got angry because someone had opened an expensive bottle of wine, and went to sleep. Calles, Jose, Muratti-Hani, and Santos all agreed to kidnap Esfandiari because they were mad at her and needed to get to Florida, and Esfandiari was the only one with a car and money. Calles and Santos then left the apartment to get some money, and, while they were gone, Muratti-Hani raped Esfandiari. Jose was in the room while Muratti-Hani raped her, and Jose handed him a condom and helped hold her down. When Calles and Santos returned, Jose told Calles that Muratti-Hani raped Esfandiari, and everybody, including Calles, laughed. Calles, Jose, Muratti-Hani, and Santos then took Esfandiari and left town in her Acura for Florida. Muratti-Hani took a butcher knife and Esfandiari's laptop. At one point during the ride down to Florida, Esfandiari asked Muratti-Hani, who was holding the knife to her, whether he was going to let her live, and he told her to shut up. Esfandiari did not attempt to run away on the trip from Virginia.

10

On the morning of 17 January 2006, while the everyone else was sleeping in the West Palm Beach hotel, Esfandiari fled from the room. When they discovered that she had fled, Muratti-Hani and Santos left to get the car, while Calles and Jose stayed with Esfandiari "to calm her down." R5 at 257. Neither Muratti-Hani nor anyone else threatened Calles to participate, and Calles acted under his own free will. Muratti-Hani identified Calles from the hotel video tape as the man in the white shirt on the morning of 17 January. Muratti-Hani reported that Calles was drinking the entire trip, and denied that Calles had helped Esfandiari during the trip.

Santos, who had also pled guilty, testified consistently with Muratti-Hani. He claimed that he and Calles decided to take Esfandiari's car, money, and jewelry. After the group decided to go to Florida, Calles agreed to take Esfandiari with them; no one threatened Calles because they had all agreed on the idea together. Calles suggested that they wear socks on their hands in Esfandiari's home so that they would not leave fingerprints, and initially retrieved the butcher knife used to subdue Esfandiari. They took Calles's clothes and Esfandiari's television and laptop, but none of Esfandiari's clothes or medication, and, at Calles's suggestion, they left the building through the emergency exit. Calles moved the car so that they could load it on the side of the building.

11

Christina Silkvillegas, a West Palm Beach radiologic technologist, testified that while conducting a CAT scan on Esfandiari on 17 January, Esfandiari told her that she had been kidnaped by her boyfriend and had been beaten and raped. Mercedes Hall, Calles and Jose's aunt, testified that they had stopped by Hall's West Palm Beach home in the middle of the night and stored some of their belongings so that they would not get stolen at the hotel. The day after the incident at the hotel, Esfandiari left a message on Hall's cellular telephone, explaining that Calles, Jose, Santos and another man had kidnaped, beaten, and raped her. Esfandiari later told Hall that she wanted the defendants imprisoned for life and that she was through with Calles. She never mentioned that Calles was a victim but, a few months later, changed her story and told Hall that she was still in love with Calles and thought that he was a victim.

Esfandiari testified that she was confronted in bed by the four defendants who demanded money, credit cards, and pin numbers. She said that Muratti-Hani held a knife to Calles's back, and Calles told her to remain calm and supported her statement that she didn't have as much money as they were demanding, even though Calles knew the statement was not true. Santos took her credit card and demanded that Calles go with him to get money. When Calles and Santos returned, she explained that, although Jose referred to some activity between

12

Muratti-Hani and Esfandiari, Calles did not understand that she had been raped. Calles hid some of her jewelry to prevent the others from stealing it. Jose held a knife to her and told her that she would never see her children again and wouldn't be needing her medication anymore. During the trip, Calles handed her a tube of her lipstick which she later used it to write a "help note" on a bathroom wall at a McDonald's in Georgia when the group stopped. R5 at 403. Esfandiari disagreed with Hall's testimony, and said that she had told Hall that Calles did everything he could to save her life. She explained after she had left the hotel room on 17 January, Calles comforted her and stood up to the others because they were finally safe. She admitted that, as she ran from the hotel room, she shouted for someone to call 911 and that she had been held at knife point, but that Calles ran after her and grabbed her neck in order to calm her. She denied that Calles had tried to pull her away from the railing and claimed that she was never afraid of him.

She claimed that Silkvillegas's testimony was not accurate, but explained that, although she did not tell Bell or Colombino that Calles was a victim, she was never given the opportunity to do so. She reported that she told Virginia Beach Police Department Detective Rhonda Bider that Calles was a victim who was forced to go along with the others. Esfandiari explained that she had no need to lie for Calles but that she was engaged to him and loved him more than ever because

13

he saved her life. Esfandiari noted that she had submitted an affidavit one month after the incident to the State Attorney's office which stated that Calles was innocent and that she did not wish to press charges against him because he was not one of the people who kidnaped her.

Bider testified that, after she was informed by Colombino that Esfandiari had been the victim of a kidnapping and rape by Calles, Jose, Muratti-Hani, and Santos, she met with Esfandiari for four hours on 19 January 2006, and at no point did Esfandiari tell her that Calles was innocent or that Calles had a knife to his back forcing him to participate. Esfandiari specifically told her at that time that Calles, along with Jose, Muratti-Hani, and Santos, committed the crimes against her. Over a month later, however, Esfandiari told Bider that she did not want to press charges against Calles.

Jose, who had also pled guilty, testified that neither Muratti-Hani nor Santos held a knife to Calles's back, that Calles voluntarily participated in the kidnapping of his own free will, and that all four men decided to kidnap Esfandiari and take her car to Florida. On cross-examination, Jose admitted aiding Muratti-Hani when he raped Esfandiari.

Santiago also testified at trial. He said that, during his two hour interview with Esfandiari, she told him that all four defendants walked into her bedroom

14

laughing with socks on their hands, and all four, including Calles, pinned her down and demanded her money and credit cards. She told Santiago that Jose helped Muratti-Hani rape her, that Jose held a knife to her back and told her to waive goodbye to her children, and that she wrote a help note on a McDonald's bathroom wall. Santiago then interviewed Calles, and he stated that he was a willful participant and that he knew what he was doing was wrong. R6 at 588-94, 606. The first time that Santiago heard that Muratti-Hani held a knife to Calles's back was during Esfandiari's testimony the previous day.

Calles did not put on a defense or testify, but moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29 based on insufficient evidence. He argued that his codefendants testimony was unreliable, that Esfandiari's testimony should be given great weight, and that her statements made to law enforcement immediately following the incident were unreliable in light of her physical and mental state at that time. The court denied the motion, stating:

> [T]here's abundant evidence from which a reasonable jury can find the defendant guilty of the crimes charged in the indictment. They include the physical evidence, the statements of the defendant, the circumstances of the case, defendant's own words to the agent, as well as the testimony of the victim. I think that the jury could well believe that her earlier statements are the truth. Unfortunately, we all have the tendency to perhaps reconcile or rationalize the actions of those we care about, and I think the jury can readily conclude that's what happened here. So I'm going to deny your motion.

15

Id. at 612. Following closing arguments, the jury returned a guilty verdict on both counts in the indictment.

The district court sentenced Calles to 228 months in prison on Count One and 120 months in prison on Count Two, to be served concurrently. Calles timely appealed the verdict, convictions, sentences, and pre-trial and trial motions.

The day after Calles filed his notice of appeal, he filed a motion for new trial based on newly discovered evidence, namely, the recantation of Jose's trial testimony. The motion explained that defense counsel received a letter from Jose, dated 22 December 2006, that stated that Jose had been forced by the government to testify against Calles. In the letter, which was attached to the motion, Jose stated that Muratti-Hani and Santos threatened both Calles and Jose with a knife to force them to participate in the kidnapping and to take drugs, and that neither Calles or Jose had anything to do with the crimes. The court denied the motion for a new trial without discussion. R2-167. Calles neither amended his previous notice of appeal nor filed another notice of appeal seeking review of that order.

## II. DISCUSSION[2]

---

[2] Calles does not argue on appeal that his statements should have been suppressed based on Fed. R. Evid. 403, or that the government failed to introduce evidence of the corpus delicti of the crime. He also fails to explain how his arrest was unlawful, and how the use of his post-arrest statements violated the Fourth Amendment. These issues are thus abandoned on appeal. Mathews v. Crosby, 480 F.3d 1265, 1268 n.3 (11th Cir. 2007) (holding that the failure to set forth any argument in the brief as to how the district court erred renders an issue abandoned).

16

A.  Denial of Calles's Motion to Suppress His Post-arrest Statements

Calles argues that the district court erred by denying his motion to suppress his statements, confessions, and admissions because the statements were obtained in violation of his Fifth and Sixth Amendment rights.  He contends that, despite his execution of a formal waiver, his lack of familiarity with the process, inability to speak or read English and Spanish, and low-level of education prevented him from knowingly and voluntarily waiving his Miranda rights.  He maintains that the statements were critical to the jury's deliberations, and constituted the fruit of an unlawful arrest in violation of the Fourth Amendment.

The government concedes that Calles was subject to custodial interrogation, but argues that Calles knowingly and voluntarily waived his Miranda rights.  The government points out that the officers spoke in Calles's native Spanish language, slowly explained all of Calles's rights before he signed the notification of rights form, reiterated that Calles could stop the interview at any time, and ensured that Calles was in fact comprehending the rights.  The government adds that Calles was forthcoming with the officers and offered to make  a statement.

We will uphold a district court's fact finding that a defendant waived his Miranda rights unless it is "clearly erroneous, but [review] the application of law to that finding . . . de novo."  United States v. Farris, 77 F.3d 391, 396 (11th Cir.

17

1996).  "All facts are construed in the light most favorable to the prevailing party below."  United States v. Perez, 443 F.3d 772, 774 (11th Cir. 2006).  It is the fact-finder's province to make credibility determinations.  United States v. Brown, 441 F.3d 1330, 1346-47 (11th Cir. 2006), cert. denied, _ U.S. _, 127 S. Ct. 1149 (2007).

"Under Miranda, a police officer must read certain warnings–including the right to remain silent–to a suspect before subjecting him to 'custodial interrogation.'"  United States v. Glover, 431 F.3d 744, 747-48 (11th Cir. 2005) (per curiam).  "Evidence obtained in violation of Miranda is inadmissible at trial."  Id. at 748.  The government must "prove by a preponderance of the evidence that the defendant" made a knowing, voluntary and intelligent waiver of his Miranda rights.  Id.  The Supreme Court has established the following two-part inquiry for determining whether a defendant has knowingly and voluntarily waived his rights under Miranda:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both of the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the Miranda rights have been waived.

18

Moran v. Burbine, 475 U.S. 412, 421, 106 S. Ct. 1135, 1141 (1986). A district court may find a knowing and intelligent waiver where the defendant has a low-level education and an inability to speak English, United States v. Beale, 921 F.2d 1412, 1435 (11th Cir. 1991), and where the defendant with a low IQ voluntarily and knowingly waived his Miranda rights where he "interacted normally and intelligently with the arresting agents and . . . was familiar with the criminal justice system." Glover, 431 F.3d at 748. Similarly, although "[m]ental illness is a factor to be considered by the trial court, mental retardation does not by itself prevent a defendant from voluntarily [and intelligently] waiving his [Miranda] rights." Dunkins v. Thigpen, 854 F.2d 394, 399 (11th Cir. 1998) (addressing habeas corpus petition).

It is undisputed that Calles was subject to custodial interrogation necessitating Miranda warnings. The officers provided the requisite Miranda warnings, and Calles knowingly and voluntarily waived these rights. First, there was no evidence that the waiver was the involuntary product of any coercion, deception, or intimidation by Santiago or Rivera. Santiago testified that he did not bring his pistol into the interview, raise his voice, or make any threats or promises, and that Calles was eager to tell the truth and never requested an attorney. There is no evidence that Calles's decision to cooperate was not the product of a free and

19

unconstrained choice.

Second, the evidence established that Calles's waiver was knowing and intelligent. See Moran, 475 U.S. at 421, 106 S. Ct. at 1141. Santiago testified that he spoke to Calles in Spanish, identified himself and explained the purpose of the interview, slowly read and explained to Calles his rights, ensured that Calles understood these rights, and reported that Calles was eager to speak without the presence of an attorney. Santiago and Rivera also informed Calles that he could stop the questioning at any time. Contrary to Calles's argument on appeal, his inability to speak English and his low-level education did not, by themselves, prevent him from waiving his rights, and there is no indication that Calles misunderstood these basic rights after they were explained to him. See Beale, 921 F.2d at 1434; Dunkins, 854 F.2d at 399. Indeed, Santiago took additional measures to ensure that Calles did in fact understand his rights by having Calles read the rights aloud, explaining any confusion that arose, and watching Calles during this process to ensure that he understood his rights. The court's finding that Calles was intelligent enough to understand his rights, as measured by his ability to function in society–holding several jobs and participating in a relationship with an educated woman–was not clearly erroneous in light of Esfandiari's testimony to that effect. See Glover, 431 F.3d at 748. The district court did not err in finding

that the government proved by a preponderance of the evidence that Calles knowingly and voluntarily waived his Miranda rights.

B.  Sufficiency of the Evidence to Sustain Calles's Convictions

Calles argues that the evidence at trial was insufficient to sustain his convictions for kidnapping and interstate transportation of a stolen vehicle.  Calles relies exclusively on Esfandiari's trial testimony that Calles was not a willing participant, that he had a knife to his back forcing him to participate, that he was as much of a victim as she was, and that he ultimately saved her life.

The government responds that, drawing all reasonable inferences in the government's favor, no rational jury could arrive at any conclusion other than that Calles was a willing participant in the kidnapping and automobile theft.  The government argues that this result is compelled by the testimony of Calles's three codefendants, Esfandiari's initial statements to numerous individuals, eye witness accounts outside the hotel, and video surveillance of the incident at the hotel.

We review a district court's denial of judgment of acquittal on sufficiency of evidence grounds de novo .  United States v. Browne, 505 F.3d 1229, 1253 (11th Cir. 2007).  "In reviewing a sufficiency of the evidence challenge, we consider the evidence in the light most favorable to the [g]overnment, drawing all reasonable inferences and credibility choices in the [g]overnment's favor."  Id.  "If a

reasonable jury could conclude that the evidence establishes guilt beyond a reasonable doubt, we will affirm the verdict." Id. "It is well established that credibility determinations are the exclusive province of the jury." United States v. Calderon, 127 F.3d 1314, 1325 (11th Cir. 1997) (citation, quotation, and alteration omitted).

"To sustain a conviction for a violation of 18 U.S.C.[] § 1201(a)(1) the government must establish beyond a reasonable doubt a transportation in interstate commerce of an unconsenting person being held for ransom or reward or otherwise, and such acts must be knowingly and willfully done." United States v. Chancey, 715 F.2d 543, 546 (11th Cir. 1983) (citations omitted). "The act of holding a kidnapped person for a proscribed reason necessarily implies an unlawful physical or mental restraint for an appreciable period against the person's will and with a willful intent so to confine the victim." Chatwin v. United States, 326 U.S. 455, 460, 66 S. Ct. 233, 235 (1946).

To obtain a conviction for the interstate transportation of a stolen vehicle under 18 U.S.C. § 2312, "the government has the burden of proving (1) that the car was stolen, (2) that defendant transported it in interstate commerce and (3) that defendant had the requisite guilty knowledge concerning the theft of the car." Fitzpatrick v. United States, 410 F.2d 513, 514-15 (5th Cir. 1969).

"To establish that he executed an illegal act under duress, [a defendant] must show that he acted under an immediate threat of death or serious bodily injury, that he had a well-grounded fear that the threat would be carried out, and that he had no reasonable opportunity to escape or inform police." United States v. Jones, 32 F.3d 1512, 1515 (11th Cir. 1994) (per curiam) (citation and quotation omitted). In Jones, we held that the evidence was sufficient to negate the defendant's assertion that the codefendants kept a gun on him and forced him to participate in an armed bank robbery where, inter alia, "none of [the witnesses] saw any of the robbers holding a gun directed at any of the other robbers." Id. at 1516.

Calles does not argue that the codefendants' actions failed to satisfy the elements of kidnapping or the interstate transportation of a stolen automobile. There is no question that the defendants collectively kidnapped Esfandiari and transported her across state lines and knowingly stole her car and drove it across state lines. Instead, Calles argues that, based exclusively on Esfandiari's trial testimony, he was a victim rather than a participant, and, therefore, the evidence was insufficient to support his convictions for these offenses. Contrary to Calles's argument, however, there was ample evidence presented at trial for a jury to reject Calles's duress defense and conclude that he willfully and knowingly participated in these factually related offenses. See Jones, 32 F.3d 1515-16. All three

codefendants testified that Calles was a knowing and voluntary participant in the planning and execution of the offenses. Santiago testified that Calles admitted to knowingly participating in the offenses. Christ testified that the man in the white shirt, later identified as Calles, physically prevented Esfandiari from entering the hotel office and yanked on her in an attempt to dislodge her from the railing. Law enforcement officers testified that Calles had a pocket knife and Esfandiari's credit cards at the time of the arrest. There was testimony that it was Calles's idea for the codefendants to wear socks in Esfandiari's home to avoid leaving fingerprints and that it was Calles who initially retrieved the knife used to subdue Esfandiari. In addition, the jury was free to disregard Esfandiari's trial testimony that Calles was a victim or acting under duress because, immediately following the incident, Esfandiari indicated to Silkvillegas, Hall, Bell, Creelman, Colombino, Lefont, and Bider that Calles was responsible for what had happened to her. A reasonable jury could have concluded that Esfandiari later changed her story, and it was within the jury's province to disbelieve her trial testimony and believe her initial statements to the police. See Calderon, 127 F.3d at 1325. Further, the jury could have found Esfandiari's trial testimony incredible for the additional reason that it was likely a product of her emotional and romantic attachment to Calles. There was abundant testimony at trial that would permit a jury to conclude that Calles was a knowing

24

and voluntary participant in the offenses.  Therefore, despite Esfandiari's testimony to the contrary, and drawing all reasonable inferences and credibility choices in the government's favor, the evidence was sufficient for a jury to find Calles guilty of kidnapping and the interstate transportation of a stolen vehicle.

## C.  Calles's Motion for a New Trial

Calles argues that the district court erred by not granting him a new trial based on the post-judgment recantation of Jose's trial testimony.[3]  Calles relies on

---

[3]  We review sua sponte our jurisdiction over the appeal from the denial of the motion for new trial.  United States v. Petrie, 302 F.3d 1280, 1283 (11th Cir. 2002).  A defendant's notice of appeal ("NOA") must be filed within 10 days of the judgment of conviction.  Fed. R. App. P. 4(b)(1)(A).  If a motion for a new trial is filed within 10 days of the criminal judgment, the time for filing the NOA is tolled and the defendant instead must file his NOA within 10 days of the order disposing of such a motion.  Fed. R. App. P. 4(b)(3)(A)(ii).  "A valid [NOA] is effective--without amendment--to appeal from an order disposing of [a tolling motion for a new trial]."  Fed. R. App. P. 4(b)(3)(C).  The NOA must designate the judgment or order from which an appeal is taken.  Fed. R. App. P. 3(c)(1)(B).  Calles timely filed his NOA within 10 days of the underlying criminal judgment, as required by Rule 4(b)(1)(A).  The next day, however, he filed a timely tolling motion for a new trial.   The district court subsequently denied that motion, and Calles did not thereafter file an amended notice of appeal.

Rule 4(b)(3)(C) provides that a valid NOA is effective without amendment to appeal from an order disposing of a tolling motion for a new trial.  Under its plain language, there is nothing in Rule 4(b)(3)(C) that explicitly requires the tolling motion to already be pending on the date that the NOA is filed.  Moreover, our reasoning in United States v. Wilson, 894 F.2d 1245 (11th Cir. 1990), appears to support the exercise of jurisdiction under the facts of this case.  In Wilson, we  considered whether a second NOA was required to appeal the district court's denial of a motion for a new trial.  Id. at 1251.  We recognized that it was "clearly the better practice to perfect a separate appeal from the denial of a motion for a new trial on the ground of newly discovered evidence."  Id.  We noted that an appellant's brief could serve as a substitute for a separate NOA and that, "without a showing of prejudice against the government, it would be unreasonable and unfair to refuse to consider an issue which was thoroughly briefed and clearly recognized as an issue by both parties.  Id. at 1252 (quotation and alteration omitted).  In this case, both parties thoroughly briefed the issue regarding the district court's denial of Calles's motion for a new trial.  As such, the government assumed that the district court's denial of the motion for a new trial was properly before us on appeal, and the government would not suffer any prejudice if we reviewed the propriety of the district court's ruling on the merits.  Based on

25

Jose's letter, which stated that he and Calles were threatened by the other codefendants to participate, that neither of them had anything to do with the offenses, and that he was forced to take a plea and testify against his brother based on the potential life sentence he might receive. Calles argues that a new trial should be granted based on this recantation because the jury heavily relied on Jose's testimony because he was Calles's brother, the recantation was consistent with Esfandiari's testimony, and the recantation casts doubt on the testimony of Muratti-Hani and Santos.

The government responds that the district court acted within its discretion by denying Calles's motion for a new trial. The government points out that Jose's letter is contradicted by all of the evidence at trial, including the testimony of Esfandiari, who never asserted that Jose was not a full participant. The government concedes that Jose's recantation may be material, but argues that the evidence does not satisfy any of the other four factors required to obtain a new trial. The government notes that Jose's trial testimony was not necessary to obtain Calles's conviction in light of the other evidence in the case, and Calles's cross-examination of Jose established only that Jose held Esfandiari down while she was raped. The government emphasizes that the district court observed the multiple

this reasoning, we find that we have jurisdiction over Calles's appeal from the denial of the motion for new trial.

witnesses at trial and weighed that evidence against the unsworn and incredible recantation of Jose.

We review the denial of a motion for a new trial for abuse of discretion. United States v. Thompson, 422 F.3d 1285, 1294-95 (11th Cir. 2005). "A district court abuses its discretion if it fails to apply the proper legal standard or to follow proper procedures in making the determination, or makes findings of fact that are clearly erroneous." United States v. Izquierdo, 448 F.3d 1269, 1276 (11th Cir. 2006) (per curiam) (citation and quotation omitted).

A defendant may move the district court for a new trial based on newly discovered evidence. Fed. R. Crim. P. 33(b)(1). A new trial based on newly discovered evidence "is warranted only if: (1) the evidence was in fact discovered after trial; (2) the defendant exercised due care to discover the evidence; (3) the evidence was not merely cumulative or impeaching; (4) the evidence was material; and (5) the evidence was of such a nature that a new trial would probably produce a different result." Thompson, 422 F.3d at 1294 (citation and quotations omitted). A motion for new trial will fail if "any one of these elements" is unsatisfied. Id. (citation and quotation omitted). "Motions for a new trial based on newly discovered evidence are highly disfavored in the Eleventh Circuit and should be granted only with great caution. Indeed, the defendant bears the burden of

justifying a new trial." United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006) (en banc) (quotation omitted).

We will affirm a district court's denial of a motion for a new trial when the newly discovered evidence would probably not produce a different result at a new trial. In United States v. Lee, we held that new testimony would probably not produce a new result where the government was likely to impeach the new testimony with the witness's own inconsistent trial testimony. 68 F.3d 1267, 1274 (11th Cir. 1995). In Thompson, we held that the new testimony would probably not produce a different result where it would not impeach the testimony of a witness who underwent extensive cross-examination and where the new testimony was implausible. 422 F.3d at 1295. In United States v. Schlei, we held that new testimony that was cumulative and corroborative to the detriment of the defendant would probably not produce a new result at trial. 122 F.3d 944, 993-94 (11th Cir. 1997).

We need not address the first four prongs of the new trial analysis in this case because Jose's proposed, new testimony–that he and Calles were forced to participate in the kidnapping–would probably not produce a different result at a new trial. First, the substance of Jose's letter is implausible. See Thompson, 422 F.3d at 1295. There was no evidence presented at trial, including the testimony of

Esfandiari, suggesting that Jose was anything but a willful participant in the offenses. Indeed, Esfandiari testified that Jose held the knife to her and told her to waive goodbye to pictures of her children because she would never see them again. Furthermore, Calles used his cross-examination of Jose to confirm Jose's participation in Esfandiari's rape. Second, the government would be able to impeach Jose's new testimony. See Lee, 68 F.3d at 1274. Jose was Calles's brother and therefore had a motive to lie in order to help Calles. The government also could impeach Jose's credibility based on the inconsistency between his letter and his trial testimony, where he testified that Calles was a willful participant in the offenses. For these reasons, Jose's proposed new testimony would also be unlikely to impeach or cast doubt on the significant number of witnesses, including several law enforcement officers, the other two codefendants, and the disinterested eye witnesses, who were subject to cross-examination and consistently testified as to Calles's willful participation in the offense. See Thompson, 422 F.3d at 1295. Finally, Calles's argument that the jury heavily relied on Jose's testimony is belied by the fact that his testimony was brief, lacked detail, and was cumulative. Therefore, the district court did not abuse its discretion by denying Calles's motion for a new trial because Jose's proposed testimony would probably not produce a different result at trial.

### III. CONCLUSION

Upon review of the record and the parties' briefs, we discern no reversible error.  Because Calles voluntarily, knowingly, and intelligently executed the <u>Miranda</u> waiver, the district court did not err in denying his motion to suppress. The evidence was sufficient for a jury reasonably to find Calles guilty of kidnapping and the interstate transport of a stolen vehicle.  The district court did not abuse its discretion in denying Calles's motion for a new trial because the new evidence would probably not produce a different result at a new trial.

**AFFIRMED.**