[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10607

_____

D.C. Docket No. 1:17-cv-01819-TWT

DENNIS QUINETTE,

Plaintiff - Appellee,

versus

DILMUS REED,
CHIEF LYNDA COKER,
CHIEF DEPUTY MILTON BECK,
COLONEL DONALD BARTLETT,
COLONEL LEWIS ALDER, et al.,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(February 21, 2020)

Before WILSON and GRANT, Circuit Judges, and MARTINEZ,[*] District Judge.

PER CURIAM:

This case arises out of an altercation between Cobb County Detention Center officer Dilmus Reed and inmate Dennis Quinette in which Reed allegedly caused the fracture of Quinette's hip by pushing him with two hands onto the floor of his cell.  Quinette brought 42 U.S.C. § 1983 claims against Reed and his supervisors and a state law assault and battery claim against Reed alone.  The district court denied the defendants' motion to dismiss the complaint.  The court's order had the effect of denying qualified immunity on the federal claims and official immunity on the state law claim to all defendants.  The officers appeal that denial.  We affirm the district court's denial of qualified and official immunity to Reed, but reverse the district court's denial of qualified immunity based on supervisory liability.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

The incident occurred at the Cobb County Detention Center, where 54-year-old Quinette was detained in a video-monitored cell.[1]   He had recently been arrested and was in the process of being booked into the detention center.  Quinette

---

[*] Honorable Jose E. Martinez, United States District Judge for the Southern District of Florida, sitting by designation.

[1] In reviewing the district court's denial of the motion to dismiss, we accept the complaint's well-pled allegations as true and construe them in the light most favorable to Quinette. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012).  Accordingly, we recite the facts as Quinette has alleged them.

was housed in an intake cell; detention center officers planned to move him to the general jail population after his booking was completed. While in the intake cell, Quinette stood at the cell door for several minutes, hoping to get a jailer's attention so that he could make a phone call. As Reed opened the cell door and brought another inmate into the cell, Quinette asked for Reed's help. Quinette can be heard saying "excuse me" on the video recording of the intake cell.

Quinette "remained respectful and polite, never banging loudly on the cell door or window, never yelling, and never causing any sort of disturbance." Instead of helping Quinette, Reed shut the door on him. Quinette placed his hand on the window of the cell door as it closed. He exerted no "force or pressure" on the window and did not prevent the door from closing. At that point, Quinette was "not resisting any officer," "not presenting a threat of any kind," and "not causing a disturbance." After the cell door made contact with the doorframe, Reed reopened it and stepped into the cell. Then, without warning, Reed shoved Quinette with two hands. The shove threw Quinette backwards, where he fell hard onto the cell floor. He howled and curled up in pain. His hip was broken in the fall.

Reed walked away as Quinette lay motionless on the cell floor. A minute later, he returned, attempting to drag Quinette to his feet. Quinette again howled in

3

pain, unable to stand.  Reed berated Quinette, leaning over him and yelling, "[y]ou tried to rush me!"

For approximately an hour, Quinette remained on the concrete floor as medical staff and jailers attempted to treat him.  Emergency medical personnel then took him to the emergency room, where he was diagnosed with a broken hip.

Reed was terminated from his position after an internal affairs investigation into this incident concluded that he had failed to comply with the Cobb County Sheriff's Office's policies and procedures. During the investigation, Reed acknowledged that he had used more force than was necessary.  This was the twelfth investigation into Reed's conduct while he was working at the Cobb County Detention Center.  In six of the investigations, Reed was found to have violated Cobb County Sheriff's Office policy; three involved the use of excessive force on inmates.  Quinette alleges that the defendants who were part of the jail's supervisory staff ("Supervisor Defendants") "turned a blind eye" to Reed's actions despite their knowledge of his violations of detention center policy, thus "ensur[ing] that . . . Reed would ultimately cause a serious injury to an inmate."  In two of the three investigations into Reed's excessive use of force, the Cobb County Sheriff's Office disciplined Reed after finding that he had indeed used excessive force.  The Sheriff's Office did not terminate him until after the incident with Quinette.

4

Quinette sued Reed and the Supervisor Defendants, bringing claims under 42 U.S.C. § 1983 against all the defendants, as well as a state law assault and battery claim against Reed alone.  The defendants moved to dismiss the lawsuit, claiming that they were entitled to qualified and official immunity.  With their motion to dismiss, the defendants filed a copy of a video of the incident recorded in the holding cell.  The district court denied Reed qualified immunity because his alleged use of force violated Quinette's clearly established constitutional right.  The court denied the Supervisor Defendants qualified immunity and determined that, under the facts as alleged, they could be held liable for the constitutional violations.  Finally, the district court denied Reed official immunity under Georgia law because he allegedly acted with malice.  All defendants appealed.

## II.    STANDARD OF REVIEW

We review *de novo* the denial of a motion to dismiss on qualified or official immunity grounds, applying the same standard as did the district court.  *See Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016).  In doing so, we accept the facts alleged in the complaint as true and draw "all reasonable inferences in the plaintiff's favor."  *Keating v. City of Miami*, 598 F.3d 753, 762 (11th Cir. 2010).

In reviewing a motion to dismiss, we are generally limited to the pleadings themselves.  Fed. R. Civ. P. 12(b)(6).  But we may also consider those "documents incorporated into the complaint by reference, and matters of which a court may

5

take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The complaint in this case references video footage from the camera in the intake cell. A document or thing is incorporated by reference into a complaint where (1) it is central to the plaintiff's claim, (2) its contents were alleged in the complaint, and (3) no party questions those contents. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). Here, all three factors are met, so we consider the video footage. Where a video in evidence "obviously contradicts [the nonmovant's] version of the facts, we accept the video's depiction instead of [the nonmovant's] account," *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010), and "view[] the facts in the light depicted by the videotape," *Scott v. Harris*, 550 U.S. 372, 380-81 (2007).

### III.   LEGAL ANALYSIS

This case is an interlocutory appeal from the district court's decision denying Reed and the Supervisor Defendants qualified and official immunity. As an initial matter, we address whether we have jurisdiction to hear this interlocutory appeal. Because the district court has not entered a final order in this case, the scope of the appeal is narrow. *See Harris v. Bd. of Educ. of Atlanta*, 105 F.3d 591, 594 (11th Cir. 1997). This Court has jurisdiction to review an interlocutory appeal from the denial of qualified immunity pursuant to 28 U.S.C. § 1291. *Mitchell v. Forsyth*, 472 U.S. 511, 526-27 (1985). We likewise have jurisdiction to review an

interlocutory appeal from the denial of official immunity under Georgia law. *Griesel v. Hamlin*, 963 F.2d 338, 341 (11th Cir. 1992). Because we have jurisdiction, we now address the merits of the defendants' arguments regarding qualified and official immunity.

## A.    Reed's Two-Handed Shove Despite Quinette's Compliance and Non-Resistance Violated the Fourth or Fourteenth Amendment.

Qualified immunity provides complete protection for government officials sued in their individual capacities where their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures "that before they are subjected to suit, officers are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks omitted). An officer is entitled to qualified immunity where his actions would be objectively reasonable to a reasonable officer in the same situation. *Anderson v. Creighton*, 483 U.S. 635, 638-41 (1987). We are mindful that officers face "facts and circumstances [that] are often 'tense, uncertain and rapidly evolving,' thereby requiring 'split-second judgments' as to how much force is necessary." *See Garczynski v. Bradshaw*, 573 F.3d 1158, 1167 (11th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 397 (1989)).

To assert a qualified immunity defense, an officer must have been "acting within the scope of his discretionary authority when the allegedly wrongful acts

7

occurred." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks omitted). Here, it is undisputed that Reed was acting in his discretionary authority.

We conduct a two-step inquiry to determine whether a defendant is entitled to qualified immunity. The court must determine (1) "whether the facts alleged show the officer's conduct violated a constitutional right," and (2) "whether the right was clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation marks omitted). We need not address these steps in sequential order. *See id.* at 236.

We start by identifying the "precise constitutional violation" at issue. *Baker v. McCollan*, 443 U.S. 137, 140 (2007). The allegations in the complaint establish that Quinette was in a holding cell at the Cobb County Detention Center, awaiting completion of the booking process before being transferred into the general detention center population.

Quinette's allegations support a conclusion either that at the time of the incident he was still being seized, in which case we would analyze his claim under the Fourth Amendment, or that his pretrial detention had begun, in which case we would analyze his claim under the Fourteenth Amendment. In this Circuit, "[t]he precise point at which a seizure ends (for purposes of the Fourth Amendment coverage) and at which pretrial detention begins (governed until conviction by the

8

Fourteenth Amendment) is not settled." *Hicks v. Moore*, 422 F.3d 1246, 1253 n.7 (11th Cir. 2005). We need not delineate that point now, because even though the district court concluded that the Fourteenth Amendment applied, Quinette has pled facts that support a violation of either the Fourth or the Fourteenth Amendment. In *Kingsley v. Hendrickson*, the Supreme Court clarified that to prove an excessive force claim in violation of the Fourteenth Amendment, a "pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." 135 S. Ct. 2466, 2473 (2015). This objective reasonableness standard mirrors the standard an arrestee must meet to plead a violation of the Fourth Amendment. *See Graham*, 490 U.S. at 397 (stating that in an excessive force case "the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them" (internal quotation marks omitted)). So we turn to the question of whether Reed's force was objectively reasonable.

We gauge whether force is objectively unreasonable "from the perspective of a reasonable officer on the scene." *Kingsley*, 135 S. Ct. at 2473. We employ the following factors to guide our analysis: (1) the relationship between the need for the use of force and the amount of force used; (2) the extent of the plaintiff's injury; (3) any effort made by the officer to temper or to limit the amount of force; (4) the severity of the security problem at issue; (5) the threat reasonably perceived

by the officer; and (6) whether the plaintiff was actively resisting.  *Id.* (citing *Graham*, 490 U.S. at 386).

Every *Graham* factor weighs in Quinette's favor.  The first factor is the most significant here:  the allegations establish that Reed had no need to use *any* force on the non-resistant Quinette.  According to the complaint, at the time of the incident in question, Reed had closed the door on Quinette, and the door was ready to latch.  Quinette stood calmly at the door to the prison cell.  He remained "respectful and polite, never banging loudly on the cell door or window, never yelling, and never causing any sort of disturbance."  Reed nevertheless reopened the door, took a step inside the prison cell, and, using two hands, shoved Quinette onto the floor.  Reed argues that he used this force against Quinette because he feared that Quinette's fingers would be caught in the closing door.  But that reason does not hold up:  Quinette alleges that Reed had already closed the door, so that it made contact with the door frame and was ready to be latched, before Reed reopened it and pushed Quinette.

On the second and third factors, Quinette's injuries were severe, and Reed made no effort to temper the amount of force used.  Quinette suffered a broken hip from Reed's two-handed shove.  According to the complaint, Reed never asked Quinette to step away from the door.  And rather than temper the force used, Reed stepped into the push, making it all the more forceful.  When interviewed as part of

10

the investigation into the incident, Reed allegedly admitted that the reason he used so much force was because he was angry at Quinette.

As to the fourth and fifth factors, the severity of the threat posed and the threat reasonably perceived by Reed, whatever security threat was posed by unsecured but unresisting inmates in an intake cell did not justify, under the facts alleged here, Reed's two-handed shove. Quinette himself posed no threat to Reed; he remained non-resistant, non-belligerent, and polite. Nor did a security situation at the detention center create exceptional, exigent circumstances. Immediately before Reed's shove, Quinette and his cellmates were safely contained behind a closed door that had just struck the latch. Yet Reed deliberately re-opened the closed door, stepped into the cell, and physically engaged Quinette with no warning.

Reed argues that Quinette threatened him by placing a hand on the cell door. We see it differently, for two reasons. First, the complaint alleges that Quinette used no force or pressure and neither attempted to nor actually prevented the door from closing; Reed succeeded in closing the door all the way, to the point where it made contact with the strike plate and could have latched. Second, Reed's violent shove was disproportionate to any threat posed by a prisoner's hand simply touching a door. Even if Quinette's hand was reasonably perceived as a threat, once Reed had closed the door, that threat ceased to exist.

11

Reed also argues that the presence of other inmates gave rise to a threat. He asserts that "there were at least two inmates outside the cell door, two unrestrained inmates inside the cell with Plaintiff (also standing near the unsecured door), and no additional officers or deputies in sight." Appellants' Br. at 10-11. By contrast, Quinette's complaint alleges that there was only one inmate in the cell with him at the time of the altercation.

The video footage of the cell—which we may consider because it was properly incorporated by reference into the complaint—shows that there were two other inmates in the cell with Quinette at the time of the altercation (one previously in the cell, and one brought into the cell immediately before the incident). The video also shows there were people outside the cell, but it does not reveal whether they were inmates, jailers, or other personnel. Nor is it clear whether, if those individuals were inmates, they were unrestrained, or in what way they might have posed a threat to Reed as he closed the cell door. So while the video overrides the complaint regarding how many inmates were inside the cell, it does not confirm Reed's account about any threat reasonably posed by persons outside the cell.[2]

---

[2] At the motion to dismiss stage, we cannot accept Reed's assertions that there were inmates outside the cell door who might pose a threat and that there were no additional officers or deputies in sight because we are limited to the plausible allegations in the complaint and any inferences that may reasonably be drawn from them, along with the video. *See Keating*, 598 F.3d at 762 (recognizing that at the denial of the motion to dismiss stage, our review is generally "limit[ed] . . . to the four corners of the complaint").

The presence of two other unrestrained inmates inside the cell does not render Reed's use of force reasonable. As the video shows, none of the inmates was resistant or belligerent. They were contained within an intake cell where the door had closed and struck the latch. There is no basis for us to conclude that their presence justified Reed's conduct.

On the sixth factor, Quinette never resisted Reed. Reed said nothing to Quinette: he gave no commands, warnings, instructions, or responses to Quinette's polite "excuse me," and request for help. There was nothing to resist.

In sum, every *Graham* factor supports the conclusion that Reed "used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate." *Lee*, 284 F.3d at 1198. Reed's application of a two-handed shove to a non-resistant detainee, with sufficient force to knock that detainee to the ground and to break his hip, constituted unreasonable force in violation of Quinette's constitutional right under the Fourth or Fourteenth Amendment.

Because Reed's conduct violated Quinette's constitutional right to be from the use of excessive force, we next consider whether that constitutional right was "clearly established" at the time of the violation. We conclude that it was.

**B.    Clearly Established Law Demonstrates that Reed's Conduct Was Unconstitutional.**

Reed argues that even if he used excessive force, he did not violate clearly established law. A right is clearly established when a reasonable officer would

know that his conduct violates that right. *See Coffin v. Brandau*, 642 F.3d 999, 1013 (11th Cir. 2011) (en banc). We are concerned with whether the officer had "fair warning" that his conduct would violate the right in question. *Id.* (internal quotation marks omitted). A plaintiff can demonstrate that "the contours of the right were clearly established" to the officer in several ways. *Loftus v. Clark-Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (internal quotation marks omitted). One way is by pointing to "earlier case law from the Supreme Court, this Court, or the highest court of the pertinent state that is materially similar to the current case and therefore provided clear notice of the violation." *Long v. Slaton*, 508 F.3d 576, 584 (11th Cir. 2007). For an excessive force violation, the analysis is necessarily fact-specific; prior cases need not involve mirror-image factual circumstances to clearly establish that force was excessive. *See Hope*, 536 U.S. at 741 ("officials can still be on notice that their conduct violates established law even in novel factual circumstances"); *Graham*, 490 U.S. at 396 (requiring "careful attention to the facts and circumstances of each particular case").

Alternatively, a plaintiff may rely on the "obvious clarity rule": a "narrow exception" to the "rule requiring particularized case law to establish clearly the law in excessive force cases." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000); *see Oliver v. Fiorino*, 586 F.3d 898, 908 (11th Cir. 2009). To fall within this exception, a plaintiff must identify conduct so egregious that it clearly

14

violated a constitutional right "even in the total absence of case law" to guide us. *See Lewis v. City of W. Palm Beach*, 561 F.3d 1288, 1292 (11th Cir. 2009).  Under this exception, the question we ask is "whether application of the excessive force standard would inevitably lead every reasonable officer in the Defendants' position to conclude the force was unlawful." *Priester*, 208 F.3d at 926-27 (alterations adopted) (internal quotation marks omitted).

With this framework in mind, we conclude that at the time of the incident in this case the defendants were on notice that applying force on a non-resisting pretrial detainee "violate[d] clear federal law." *Long*, 508 F.3d at 584.

Reed relies on this Court's decision in *Cockrell v. Sparks* to support his argument that the law did not clearly establish the unconstitutional nature of his conduct.  510 F.3d 1307 (11th Cir. 2007).  Like this case, *Cockrell* involved a § 1983 claim brought by an incarcerated inmate who was shoved by a deputy.  But two factors distinguish *Cockrell* from this case.  First, Cockrell was making a disturbance:  he was "banging on the door to his cell with his shoe" and "shouting at the deputy." *Id.* at 1310.  Second, the defendant deputy faced an evolving security situation; another inmate had unsuccessfully attempted suicide, and to comply with jail policy, the deputy needed to move the suicidal inmate to the "drunk tank" where Cockrell was housed. *Id.* at 1309.  The deputy moved Cockrell to the neighboring cell.  While the deputy tended to the suicidal inmate,

15

Cockrell began shouting, banging on the door, and yelling at the deputy. *Id.* at 1309-10. The deputy left the suicidal inmate, went to Cockrell's cell, told him to shut up, and gave him an open-handed shove. *Id.* at 1310. We affirmed the grant of summary judgment in that case because "Cockrell was creating a disturbance" and the deputy "legitimately needed to quiet Cockrell" because of "the need to relocate the inmate who had attempted suicide." *Id*. at 1311. But even then, we described it as a "close question." *Id*. Neither factor exists in this case, however. Here, Quinette was only ever "respectful and polite, never banging loudly on the cell door or window, never yelling, and never causing any sort of disturbance." And no security situation, analogous to that posed by the suicidal inmate in *Cockrell*, created a legitimate need for Reed to apply force.

While *Cockrell* does not help us resolve this case, our other precedent does. Our decision in *Hadley v. Gutierrez* established that a single punch to a non-resisting detainee constitutes excessive force. 526 F.3d 1324, 1330 (11th Cir. 2008). In *Hadley*, the detainee had previously, while under the influence of cocaine, run around a Publix supermarket yelling and knocking items off shelves. *Id.* at 1327. But at the time the officer punched him, he was subdued, compliant, and non-resistant. *Id.* We held that where a detainee is not resisting arrest, gratuitous use of force—even a single punch—is excessive. *Id.* at 1330. We have articulated the same principle in the Fourteenth Amendment context. *See, e.g.,*

16

*Danley v. Allen*, 540 F.3d 1298, 1309 (11th Cir. 2008) (under the Fourteenth Amendment, "[o]nce a prisoner has stopped resisting there is no longer a need for force, so the use of force thereafter is disproportionate to the need"), *overruled on other grounds as recognized in Randall v. Scott*, 610 F.3d 701, 705 (11th Cir. 2010).

We have said that law is clearly established for the purposes of qualified immunity where "'Y Conduct' is unconstitutional in 'Z Circumstances.'" *Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002). *Hadley* established that a single blow—"Y Conduct" —is unconstitutional where a detainee is non-resistant— "Z Circumstances." Here, too, there was a single blow to a non-resistant detainee. Given this clearly established law, no objectively reasonable officer in Reed's position would think it lawful to shove a non-resisting detainee to the ground. Because we conclude that *Hadley* and *Danley* put Reed on notice that his conduct violated Quinette's constitutional right, it is unnecessary for us to explore whether the conduct was egregious enough to fall within the parameters of the "obvious clarity rule."

## C.    Supervisory Liability

We next turn to whether Reed's supervisors may be held liable for his conduct. In this Circuit, a supervisor may be held responsible under 42 U.S.C. § 1983 for constitutional violations committed by subordinates where either (1) the

17

supervisor personally participated in the constitutional violation, or (2) there is a causal connection between the supervisor's actions and the constitutional violation. *Mathews v. Crosby*, 480 F.3d 1265, 1270 (11th Cir. 2007).  None of Reed's supervisors personally participated in Quinette's injury, so we look to whether there is a causal connection between their actions and the alleged constitutional violation.

The standard we employ is "extremely rigorous." *Kerr v. Miami-Dade Cty.*, 856 F.3d 795, 820 (11th Cir. 2017) (quoting *Braddy v. Fla. Dep't of Labor & Emp't Sec.*, 133 F.3d 797, 802 (11th Cir. 1998)). A plaintiff establishes a causal connection where "a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).  Those deprivations "must be obvious, flagrant, rampant and of continued duration" in order to provide meaningful notice.  *Id.*

Here, assuming the supervisors were on notice of a need to correct Reed's behavior, given his history of misconduct, they did not "fail[] to do so." *Id*. The facts alleged in the complaint show that the Cobb County Sherriff's Office *did* investigate the complaints against Reed and *did* discipline him for the instances of misconduct that were substantiated.

18

The complaint identified three previous excessive-force allegations. All three were investigated, and two were substantiated. Both resulted in formal discipline. Reed was given a written reprimand for his first substantiated violation and was also required to undergo a course in "defensive tactics." For his second substantiated violation, he received a written reprimand and was required to undergo "counseling related to the proper response to verbal abuse from inmates." In addition to these incidents, two other (non–excessive-force) substantiated investigations resulted in suspensions—a one-day suspension for misrepresentation and a two-day suspension for treating certain favored inmates differently than others. And of course, Reed was fired because of the abuse at issue in this case.

The supervisors likely could have (and, as it turns out, should have) done more to discipline Reed—but given the discipline imposed, their conduct did not violate clearly established law. In *City of Escondido v. Emmons*, the Supreme Court emphatically instructed lower courts "not to define clearly established law at a high level of generality." 139 S. Ct. 500, 503 (2019). In other words, the "precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018). Here, to deny the Supervisor Defendants qualified immunity, we must conclude that they were on notice that a failure to punish a subordinate's misconduct with sufficient severity (or anything besides

19

termination)—as opposed to a failure to investigate or provide discipline at all—was a violation of clearly established law that could expose them to personal liability.

We cannot reach this conclusion. In this Circuit, the published excessive-force cases imposing supervisory liability appear to all involve supervisors who took *no* action when aware of their subordinate's unlawful conduct. *See, e.g., Danley*, 540 F.3d at 1315 (supervisors "did not discipline known incidents, and did not conduct additional training despite knowledge that pepper spray was being improperly used on a regular basis by jailers and that inmates were being denied proper treatment after spraying incidents"); *Valdes v. Crosby*, 450 F.3d 1231, 1244 (11th Cir. 2006) (warden took no action in response to evidence of widespread beatings and torture by prison guards); *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985) (supervisor "failed to take corrective steps although he was aware of police use of unlawful, excessive force").

Here though, the supervisors *did* investigate and act when they became aware of Reed's misconduct. While reasonable minds may disagree about the level of discipline necessary to prevent further misconduct, the sanctions imposed here were real—up to and including suspension. Thus, even in the light most favorable to Quinette, his claim bears distinct differences from the circumstances present in *Danley*, *Valdes*, and *Fundiller*.

20

The case of *Depew v. City of St. Marys*, 787 F.2d 1496, 1497 (11th Cir. 1986) is no benefit to Quinette either. Initially, *Depew* involves municipal liability, not supervisory liability, and that case does not reveal whether the officer who used excessive force was the same officer who was disciplined. And the discipline imposed in *Depew*, in any event—a verbal reprimand, was *de minimis* compared to the discipline imposed on Reed. We decline to stretch *Depew* to fit the extremely rigorous standard required here.

Because our caselaw does not lead to a conclusion that Supervisor Defendants violated clearly established law, they may not be held liable for Reed's unconstitutional conduct.

## D.    State Law Claim

We turn now to Quinette's state law claim. Georgia state officials and employees are immune from liability for damages under the doctrine of official immunity—except where "they act with actual malice or with actual intent to cause injury in the performance of their official functions."  Ga. Const. art. 1, § II, para. IX(d).  Because it is undisputed that Reed was acting in his official capacity at the time of the incident, to overcome official immunity Quinette's complaint must show that Reed acted with actual malice or intent to cause injury. The district court correctly concluded that Quinette sufficiently alleged that Reed acted with actual malice by shoving Quinette.

21

Under Georgia law, "actual malice" is "a deliberate intention to do wrong, [that] does not include implied malice, i.e., the reckless disregard for the rights or safety of others." *Murphy v. Bajjani*, 647 S.E.2d 54, 60 (Ga. 2007) (internal quotation marks omitted). A deliberate intention to do wrong is "the intent to cause the harm suffered by the plaintiff[]." *Id.*

Here, under the facts alleged, there is no question that Reed intended to cause harm to Quinette. Reed intentionally reopened the closed cell door, stepped forward, and applied force without any apparent reason on a non-resistant detainee. Such a use of force—without any conceivable justification—manifests "a deliberate intention to do wrong" and defeats Reed's official immunity. *Id.*

Although one would not expect Reed's shove to lead to the serious harm that Quinette ultimately suffered, the unexpected extent of Quinette's injury does not neutralize, let alone immunize, Reed's initial misconduct. Put differently, the harm intended by Reed was the unjustified shove itself; that Quinette unexpectedly broke his hip further along the causal chain is irrelevant to our official immunity analysis. Consistent with this conclusion, the longstanding rule in Georgia is that "a tortfeasor takes a plaintiff in whatever condition he finds him." *AT Sys. Se., Inc. v. Carnes*, 613 S.E.2d 150, 153 (Ga. 2005) (quoting *Coleman v. Atlanta Obstetrics & Gynecology Group*, 390 S.E.2d 856 (Ga. 1990)). And, more particularly, a

22

wrongdoer "must bear the risk that his liability will be increased" depending on the actual physical condition of his victim. *Id.*

Under Georgia law, a "factfinder may infer from evidence that a defendant acted with actual malice." *Lagroon v. Lawson*, 759 S.E.2d 878, 883 (Ga. Ct. App. 2014).  Given the facts alleged in this complaint, a jury could properly conclude that Reed acted with "actual malice." We therefore affirm the denial of official immunity.

## IV.    CONCLUSION

We affirm the district court's denial of qualified and official immunity to Reed, but reverse and remand to the district court with instructions to dismiss Quinette's supervisory liability claim.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

23

WILSON, Circuit Judge, concurring in part and dissenting in part:

I concur in the affirmance of the district court's denial of qualified and official immunity to Reed. However, I would affirm the district court's denial of qualified immunity based on supervisory liability. Accepting Quinette's allegations as true, Reed's extensive history of using excessive force toward inmates was sufficient to put the supervisors on notice of his misconduct, and was sufficiently blatant to require them to act.

First, Quinette alleges that Reed was the subject of an internal affairs investigation in 2005. An inmate with a colostomy bag accused Reed of using excessive force by twisting the inmate's waist cuffs, causing his colostomy bag to rupture. There were no eyewitnesses or video recordings of this incident. It was determined that there was no violation of department policy, and no disciplinary action was taken against Reed.

Quinette further alleges that Reed was the subject of a second internal affairs investigation in 2006. There, Reed shoved a restrained inmate—face first—onto the floor, lacerating the inmate's lip to such a degree that he needed stitches and went to the hospital. This incident was captured on video. The internal affairs investigation concluded that Reed had used excessive force, issued him a written reprimand, and required him to complete a refresher course on defensive tactics.

24

Quinette alleges that Reed was subject to a *third* internal affairs investigation in 2009. There, Reed placed an inmate into a headlock and attempted to pull that inmate to the floor. Because the inmate was chained to a group of inmates, Reed pulled the entire group back and forth during the altercation. This incident was captured on video. The internal affairs investigation concluded that Reed used excessive force, gave him another written reprimand, and required him to receive counseling regarding appropriate responses to inmates' "verbal abuse."

Quinette alleges that all of the supervisors were aware that Reed had a history of excessive use of force. Specifically, he alleges that defendant Alder personally requested the 2006 internal affairs investigation, and defendants Coker, Beck, and Bartlett were notified of the investigation. He further alleges that Coker conducted the 2009 internal affairs investigation into excessive force; that Beck, Bartlett, Alder, Prince, and Craig were present at the hearing; and that Warren was appraised of its results. Quinette also alleges that, in the course of the 2009 investigation, some supervisors reviewed Reed's personnel file, which included the 2005 and 2006 reports of excessive force, as well as other instances in which Reed was found to have violated department policy. In addition, in 2014, Quinette alleges, defendants Prince, Warren, Beck, Bartlett, and Craig again reviewed Reed's personnel file for the purposes of an internal affairs investigation into Reed's pattern of using "racial epithets, profanity, and threats towards inmates"

25

and his "continued propensity to los[e] his temper with inmates."  The complaint further alleges that, in 2015, defendants Craig, Prince, Beck, and Warren once again reviewed Reed's personnel file for the purposes of yet another internal affairs investigation into Reed's behavior—this time for alleged favoritism towards inmates and violations of detention center policy.

Reed's history of "obvious, flagrant, [and] rampant" use of excessive force and related conduct, such as using racial epithets, profanity, and threats, and losing his temper with inmates provided meaningful notice to the supervisors that they needed to correct a constitutional violation.  *See Brown v. Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).  Indeed, of the three prior, separate investigations into Reed's excessive use of force, two involved pushing an inmate to the floor.  Three of those internal affairs investigations were for using excessive force against restrained inmates.  Quinette has sufficiently alleged that each of the supervisors was aware of Reed's history of using excessive force, yet they failed to do anything to "remedy the situation."  *See Danley v. Allen*, 540 F.3d 1298, 1315 (11th Cir. 2008), *abrogated on other grounds by Ashcroft v. Iqbal*, 556 U.S. 662 (2009), *as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010).

Accepting the complaint's well-pleaded allegations as true and construing them in the light most favorable to Quinette, the supervisors knew of the danger that Reed presented and took no action to appropriately supervise or discipline

26

him.  The district court correctly determined that they were involved in internal affairs investigations involving Reed in varying capacities, and each of them failed to adequately discipline, supervise, or train Reed.

Since Quinette has sufficiently alleged that the supervisors violated his clearly established constitutional rights, I would conclude that they are not entitled to qualified immunity.