[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10237

_____

D.C. Docket No. 2:15-cv-328-JES-MRM

ABSOLUTE ACTIVIST VALUE MASTER FUND LIMITED, ABSOLUTE
EAST WEST FUND LIMITED, et al.,

Plaintiffs-Appellees,

versus

SUSAN ELAINE DEVINE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 28, 2021)

Before WILSON, GRANT, and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

Susan Devine, who was sued for her alleged involvement in money

laundering and market manipulation schemes, appeals the District Court's denial of

her motion to modify a protective order.[1]  To briefly summarize, Devine sought to modify a joint, stipulated protective order so that she could use certain confidential materials obtained from the plaintiffs—a group of hedge funds ("the Funds")—to defend herself against a possible Swiss prosecution for her role in the schemes. But before Devine could file her motion to modify, the Funds voluntarily dismissed their case under Federal Rule of Civil Procedure 41(a)(1)(A)(i). Because the Funds' voluntary dismissal stripped the District Court of jurisdiction to consider Devine's post-dismissal motion to modify, we must vacate the District Court's order.

## I.

The events giving rise to this case stretch back to 2002 and wind from the Cayman Islands, to Switzerland, to Naples, Florida.  So, for simplicity's sake, we outline only the most relevant facts here.

Absolute Activist and the other Plaintiffs-Appellees are a group of hedge funds registered as limited liability corporations in the Cayman Islands.  In 2002, Florian Homm, Susan Devine's then-husband, founded a company—Fortune Management Limited—in the Cayman Islands.  In 2005, Fortune Management

---

[1] In reality, the District Court overruled Devine's objections to a magistrate judge's order denying her motion to modify a protective order.  But because that procedural posture is a mouthful, and because the effect is ultimately the same, we state throughout this opinion that the District Court "denied" Devine's motion to modify.

merged into Absolute Capital Management Holdings Limited ("ACM"), which served as the Funds' investment manager. Homm served as ACM's Chief Investment Officer, and as a result, was responsible for the Funds' investments. But on September 18, 2007, Homm suddenly resigned from ACM and allegedly went into hiding for five years.

Homm's abrupt exit from ACM was apparently triggered by his participation in a massive market manipulation scam, which the Funds have dubbed the "Penny Stock Scheme." From at least September 2004 through September 2007, Homm invested the Funds' money in the securities of thinly capitalized companies. These securities, sometimes referred to as "pink sheet" securities or "penny stocks," were cheap and infrequently traded, and thus they were allegedly very susceptible to price manipulation. To capitalize on the opportunity for price manipulation, Homm and his conspirators would raise money for the Funds to obtain control of a dormant or near-dormant Penny Stock Company. Once Homm had control of the Penny Stock Company, he would use the Funds' money to purchase shares of the Company through private offerings. Critically, at the time Homm made these purchases for the Funds, he and his conspirators also held shares of their own—or received shares in exchange for investing—in the Penny Stock Companies.

3

While holding their personal shares, Homm and the conspirators would artificially inflate the prices of the Penny Stocks by trading the Funds' shares amongst the Funds and with outside investors.  After the prices of the Penny Stock Companies' securities were sufficiently inflated by the massive influx of trades, Homm would use the Funds to purchase the Penny Stock shares that he and the other conspirators held in their own names.  Homm allegedly made more than $115 million from the Penny Stock Scheme, and the Funds estimate that they lost more than $200 million.

But presumably recognizing that his ill-gotten gains might eventually be exposed, Homm enlisted his then-wife, Devine, to conceal the fruits of the Penny Stock Scheme.  This second plot—the "Money Laundering Enterprise"—began with a series of "fraudulent loan agreement[s]" in which Devine purported to rent over $2 million of furniture and art from New York Art Trading, even though she and Homm owned the pieces.  In essence, this agreement (1) made Homm and Devine's assets harder to trace and (2) gave the appearance that the couple was less wealthy than they actually were.

Then, in 2006, Devine and Homm "strategic[ally]" divorced.  In the Funds' telling, this divorce allowed Devine to obtain control of some of the proceeds of the Penny Stock Scheme while simultaneously distancing herself from any criminal activity.  Despite the divorce, Devine and Homm allegedly "continued to

4

interact as spouses" by "sending each other personal and intimate emails, purchasing a home together, living together, traveling together, and moving money between each other." The Funds also allege that the Homm-Devine divorce petition identified only "a small fraction" of the couple's actual assets, omitted numerous real estate holdings, and hid "tens of millions of dollars" in ACM shares.

As part of their divorce, Homm and Devine were able to repeatedly alter the beneficiary structure of CSI Asset Management Establishment ("CSI"), a legal entity established in Liechtenstein that holds ACM shares on behalf of Devine, Homm, and their children. Essentially, the couple made retroactive some beneficiary arrangements in their divorce settlement to give the appearance that Devine—and not Homm—was the primary beneficiary of CSI. This beneficiary structure allowed Homm to circumvent a deed that prohibited him—but not his wife or his children—from selling ACM shares without prior agreement from the ACM board of directors. After the beneficiary structure was altered, Devine claimed she was designated the primary beneficiary so that she could receive future profits from the ACM shares, but the Funds claim this explanation is inconsistent with, among other things, the designation of Homm as CSI's economic beneficiary just one month before the divorce petition.

Following the couple's divorce, Homm sent two "revelatory" emails to Devine regarding the family's financial situation. On August 28, 2007, Homm

wrote that if he "c[ould] succeed [in his plan,] the children and [Devine] will sit on a multigenerational fortune," and if he could not, Devine was "fantastically protected already, the optimal outcome has been achieved in that regard." Later that same day, Homm wrote to Devine to tell her that he had "sold a good part of [his] soul and health to protect [Devine] and [their] children under the most extreme business and lifestyle duress for 18 months." Homm resigned from ACM and went into hiding less than one month later.

Ultimately, as a result of the Penny Stock Scheme, the Money Laundering Scheme, and her allegedly fraudulent divorce, Devine was able to amass assets exceeding $63,000,000. To make this money difficult to trace, she purchased a waterfront property in Naples, Florida; a seaside villa in Marabella, Spain; real estate in Mallorca, Spain; and millions of dollars' worth of gold coins. The remaining proceeds of the pre- and post-divorce schemes are, according to the Funds, spread throughout at least 20 different bank accounts around the world.

But easy come, easy go. Since 2009, the Office of the Attorney General of Switzerland has been conducting a criminal investigation into Homm's money laundering activities. As part of that investigation, Swiss prosecutors have frozen five bank accounts that were either in Devine's name or of which she was the beneficiary. Devine has given testimony and produced documents for the Swiss prosecutor, and a May 2015 indictment of another individual involved in the Penny

Stock and Money Laundering Schemes makes clear that the Swiss Attorney General's investigation extends to Devine's own conduct.

Simultaneously, in the United States, Devine was under investigation by the Department of Justice, which froze one of Devine's bank accounts containing $1,000,000 and issued a grand jury subpoena for her holdings. An arrest warrant was also issued for Homm in the Central District of California after he was charged with one count of conspiracy to commit securities and wire fraud, eight counts of securities fraud, and one count of wire fraud. In March 2013, Homm was arrested in Italy on a provisional arrest warrant, but while extradition proceedings were pending, he was released and fled to Germany. As a result, Homm landed on the FBI's "Most Wanted" list.

On May 29, 2015, the Funds filed a criminal complaint with the Swiss Attorney General against Devine. Devine was not given notice of the Swiss complaint.

The Funds then filed this action on June 1, 2015, alleging that Devine committed numerous acts of money laundering and other criminal offenses in violation of the federal RICO statute, the Florida RICO statute, and the Florida Civil Remedies for Civil Practices Act. The Funds also alleged that Devine was unjustly enriched, and that her conduct resulted in the creation of a constructive trust of the assets belonging to the funds.

7

As part of a temporary restraining order entered by the District Court in July 2015, Devine was required to produce documents identifying "all" of her assets from "anywhere in the world." Anticipating that this process would involve the release of personal financial information, Devine moved for a protective order to prevent the public disclosure of certain financial information that the parties designated as "confidential." The parties negotiated the terms of the protective order before jointly submitting it to the District Court for approval. The proposed order provided that, "[a]t the conclusion of this litigation (including any appeals) all material designated Confidential pursuant to the terms of this Protective Order shall either be destroyed or returned to the designating Party, within sixty (60) days after the conclusion of the litigation." The proposed order also permitted the parties to disclose confidential documents pursuant to a request for information from federal, state, or international criminal authorities. The District Court adopted the parties' proposed protective order on July 30, 2015.

The parties then engaged in extensive discovery: the Funds produced 624,291 documents and designated 5,456 of those documents as "Confidential." For her part, Devine produced 14,441 documents and designated 8,808 of those documents as "Confidential." And after a few motions to dismiss, the Funds' case was ultimately pared down to a single unjust enrichment claim contained in their

8

Second Amended Complaint.[2]  Then, on February 14, 2018, the Funds voluntarily dismissed their case under Federal Rule of Civil Procedure 41(a)(1)(A)(i).

In April 2018, Devine, now aware of the Swiss criminal complaint the Funds filed against her, moved to modify the joint, stipulated protective order.  In essence, Devine sought to alter the protective order so that she could (1) use the Funds' confidential documents to "defend[] herself against [the Funds'] legal offensives in Switzerland and the United States," and (2) retain copies of the Funds' confidential documents.  Devine claimed that the Funds' case in the District Court was little more than a scheme to "abuse[] the liberal discovery permitted under U.S. law" and funnel her confidential documents to the Swiss Attorney General, with whom the Funds had filed the private criminal complaint.  And by negotiating the protective order without notifying her of the Swiss complaint, the Funds fraudulently induced her to agree to its terms.  Modification of the protective order, Devine asserted, was simply a matter of "basic fairness."

The Funds responded that they were already in the process of complying with the protective order's destroy-or-return mandate, and Devine should not be permitted to "retroactively rewrite the terms of [the] protective order."  The Funds

---

[2] Devine did not file an answer or a motion for summary judgment in response to the Funds' Complaints.

also denied funneling documents to any government authority without the District Court's express permission.

A Magistrate Judge denied Devine's motion to modify the protective order, and Devine subsequently objected to the Magistrate's order. The District Court, on Devine's objections to the order, assumed jurisdiction over the proceedings but denied Devine her requested relief. The Court reasoned that Devine was not fraudulently induced to agree to the protective order because the Funds were under no duty to disclose the Swiss criminal complaint. Moreover, the Court emphasized that Devine knew that she was under Swiss investigation long before she negotiated the protective order, so the nondisclosure of the Funds' private Swiss complaint was not a material omission.

Devine now appeals. The parties' briefing retreads many of the arguments made below, though neither party addresses the impact of the Funds' Rule 41(a)(1)(A)(i) voluntary dismissal on the District Court's jurisdiction over Devine's post-dismissal motion. Nevertheless, we conclude that the Funds' voluntary dismissal of the action stripped the District Court of jurisdiction to consider Devine's motion to modify the protective order, and, as a result, we vacate the District Court's order.

10

II.

We review questions regarding a district court's subject matter jurisdiction *de novo*. *United States v. Wilson*, 979 F.3d 889, 902 n.6 (11th Cir. 2020). "[P]arties cannot waive subject matter jurisdiction," *Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999), and we are "obligated to inquire into subject matter jurisdiction *sua sponte* whenever it may be lacking." *Univ. of S. Ala. v. Am. Tobacco Co.*, 168 F.3d 405, 410 (11th Cir. 1999). Further, "[a]n appellate federal court must satisfy itself not only of its own jurisdiction, but also of that of the lower courts in a cause under review." *Mitchell v. Maurer*, 293 U.S. 237, 244, 55 S. Ct. 162, 165 (1934).

III.

Below, we begin with overviews of Federal Rule of Civil Procedure 41(a) and our case law interpreting that Rule. Then, we turn to their application to this appeal.

A.

Voluntary dismissal of an action is governed by Federal Rule of Civil Procedure 41(a). Pursuant to this rule, voluntary dismissal may occur with or without a court order:

> (1) *By the Plaintiff.*
> > (A) *Without a Court Order*. . . . [A] plaintiff may dismiss an action without a court order by filing:

11

(i) a notice of dismissal before the opposing party serves either an answer or a motion for summary judgment; or

(ii) a stipulation of dismissal signed by all parties who have appeared.

(B) *Effect*. Unless the notice or stipulation states otherwise, the dismissal is without prejudice. But if the plaintiff previously dismissed any federal- or state-court action based on or including the same claim, a notice of dismissal operates as an adjudication on the merits.

(2) *By Court Order; Effect*. Except as provided in Rule 41(a)(1), an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper. If a defendant has pleaded a counterclaim before being served with the plaintiff's motion to dismiss, the action may be dismissed over the defendant's objection only if the counterclaim can remain pending for independent adjudication. Unless the order states otherwise, a dismissal under this paragraph (2) is without prejudice.

Fed. R. Civ. P. 41(a).

Relevant here is Rule 41(a)(1)(A)(i), which "means precisely what it says." *Pilot Freight Carriers, Inc. v. Int'l Bhd. of Teamsters*, 506 F.2d 914, 916 (5th Cir. 1975).[3] The Rule's text plainly grants a plaintiff the right to dismiss—without a court order—"an action" prior to a defendant serving "either an answer or a motion for summary judgment." Fed. R. Civ. P. 41(a)(1)(A). The dismissal is, barring a few exceptions, "without prejudice." Fed R. Civ P. 41(a)(1)(B).

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

This Court has made abundantly clear that a Rule 41(a)(1) voluntary dismissal disposes of the *entire* action, not just some of the plaintiff's claims. *See PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1307 (11th Cir. 2016) ("Rule 41 'speaks of voluntary dismissal of an action, not a claim.'" (quoting *State Treasurer of Michigan v. Barry*, 168 F.3d 8, 19 n.9 (11th Cir. 1999) (Cox, J., specially concurring) (internal quotation marks omitted)). We have further stated that a plaintiff's voluntary dismissal under Rule 41(a)(1)(A)(i) "is effective immediately upon [] filing," and thus no further court order is necessary to effectuate the dismissal. *Matthews v. Gaither*, 902 F.2d 877, 880 (11th Cir. 1990). It follows from these two propositions that, upon a plaintiff's notice of a Rule 41(a)(1)(A)(i) voluntary dismissal, the "action is no longer pending," *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395, 110 S. Ct. 2447, 2455 (1990), and the district court is immediately deprived of jurisdiction over the merits of the case, *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1279 (11th Cir. 2012) ("A district court loses all power over determinations of the merits of a case when it is voluntarily dismissed.").

The district court does retain jurisdiction, however, to consider a limited set of issues after the action is voluntarily dismissed. *Cooter & Gell*, 496 U.S. at 395, 110 S. Ct. at 2455. In *Cooter & Gell*, the United States

13

Supreme Court considered a challenge to an order imposing sanctions pursuant to Federal Rule of Civil Procedure 11 for filing a frivolous complaint, entered after the plaintiff voluntarily dismissed the case under the predecessor to Rule 41(a)(1)(A)(i). *Id.* at 388–90, 110 S. Ct. at 2451–53. The Court noted that, although the plaintiff's voluntary dismissal disposed of the underlying action, the district court nevertheless retained jurisdiction to decide "collateral issues"—"independent proceeding[s] supplemental to the original proceeding and not request[s] for a modification of the original decree." *Id.* at 395, 110 S. Ct. at 2455 (first alteration in original). Among the collateral issues the Supreme Court identified were: (1) the imposition of costs, (2) the imposition of attorney's fees, (3) the imposition of contempt sanctions, and (4) the imposition of Rule 11 sanctions. *Id.* at 395–96, 110 S. Ct. at 2455–56. The Court explained that, because determinations regarding costs, sanctions, and fees do "not signify a district court's assessment of the legal merits of the complaint," a voluntary dismissal does not operate to divest the district court of jurisdiction over those issues. *Id.* at 396–98, 110 S. Ct. 2456–57.

The Supreme Court's conclusion was consistent with the purposes of Rule 11 and Rule 41(a)(1), both of which "are aimed at curbing abuses of the judicial system." *Id.* at 397, 110 S. Ct. at 2457. Noting that a voluntary

14

dismissal "does not eliminate [a] Rule 11 violation," the Court expressed concern that stripping jurisdiction from the district court over certain collateral issues would allow a litigant to "purge his violation of Rule 11 merely by taking a dismissal." *Id.* at 398, 110 S. Ct. at 2457. In turn, this would eliminate "all incentive [for attorneys] to stop, think and investigate more carefully before serving and filing papers." *Id.* (internal quotation mark omitted). Rule 41(a), the Court concluded, "does not codify any policy that the plaintiff's right to one free dismissal also secures the right to file baseless papers." *Id.* at 397–98, 110 S. Ct. at 2457.

Consistent with *Cooter & Gell*, this Circuit has permitted the post-voluntary-dismissal imposition of sanctions, *see Matthews*, 902 F.2d at 880–81 (imposing sanctions relating to a false *in forma pauperis* affidavit),[4] and motions for costs, *see Mathews v. Crosby*, 480 F.3d 1265, 1276–77 (11th Cir. 2007) (granting costs to the defendants who were voluntarily dismissed because they were prevailing parties under Rule 54(d)(1)); *cf. Sargeant v. Hall*, 951 F.3d 1280, 1287 n.4 (11th Cir. 2020) (discussing motion for costs pursuant to Federal Rule of Civil Procedure 41(d)).

---

[4] Although *Matthews* predated the *Cooter & Gell* decision by a week, it relied on many of the same circuit court decisions and largely the same reasoning. *Compare Matthews*, 902 F.2d at 880 (citing *Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600, 603–04 (1st Cir. 1988); *Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir. 1987); and *Greenberg v. Sala*, 822 F.2d 882, 885 (9th Cir. 1987)), *with Cooter & Gell*, 496 U.S. at 395, 110 S. Ct. at 2455 (citing the same).

We have also extended *Cooter & Gell* slightly beyond the categories of collateral issues (costs, fees, contempt sanctions, and Rule 11 sanctions) the Supreme Court identified.  In *PTA-FLA, Inc. v. ZTE USA, Inc.*, we considered whether a voluntary dismissal stripped a district court of jurisdiction to consider a pre-dismissal motion to confirm an arbitral award. 844 F.3d 1299 (11th Cir. 2016).  There, an arbitrator issued an award, the defendant moved to confirm the award, and the plaintiff then voluntarily dismissed its case pursuant to Rule 41(a)(1)(A)(i).  *Id.* at 1303.  Relying on *Cooter & Gell*, we concluded that the motion to confirm was a "collateral proceeding," and thus the district court retained jurisdiction to consider the motion.  *Id.* at 1308–09.  Although we recognized that the plaintiff's voluntary dismissal disposed of the entire case, *id.* at 1307, we reasoned that the motion to confirm was collateral because it "did not seek a 'judgment on the merits of [the] action,' nor did it request a modification of the arbitrator's final decree."  *Id.* at 1309 (alteration in original) (citation omitted) (quoting *Cooter & Gell*, 496 U.S. at 396, 110 S. Ct. at 2456).  We likewise expressed concern that, had we stripped the district court of jurisdiction to consider the motion, the unconfirmed arbitral award would not be "protected against challenges in other courts."  *Id.*

16

Reading Federal Rule of Civil Procedure 41(a), *Cooter & Gell*, and our case law together, it is clear that even when a voluntary dismissal disposes of an entire action, district courts retain jurisdiction to consider at least five different types of collateral issues: costs, fees, contempt sanctions, Rule 11 sanctions, and motions to confirm arbitral awards.

B.

Of course, the question in this case is whether a district court's post-voluntary-dismissal jurisdiction further extends to a motion to modify a protective order. We conclude it does not.

As an initial matter, a motion to modify a protective order does not fit neatly into the types of "collateral issues" the Supreme Court and this Court have identified. Rule 41(a)(1) was "designed to limit a plaintiff's ability to dismiss an action," and the collateral issues over which a district court retains jurisdiction are tethered to that purpose. *Cooter & Gell*, 496 U.S. at 397, 110 S. Ct. at 2456. Motions for costs, fees, and sanctions each implicate "the power to enforce compliance with the rules and standards that keep the judiciary running smoothly." *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020). If we divested the district court of jurisdiction over those motions, an enterprising plaintiff could abuse the judicial system but nevertheless get off scot free by voluntarily dismissing its case under Rule

17

41(a)(1)(A)(i).[5] Likewise, if the district court did not have jurisdiction over a motion to confirm an arbitral award, a clever plaintiff could—after an unfavorable arbitral ruling—voluntarily dismiss its case, divest the district court of jurisdiction over the motion, and challenge the unconfirmed award in another court. *See PTA-FLA*, 844 F.3d at 1309 ("ZTE USA merely sought confirmation of the arbitral award—exactly as it was issued by the arbitrator—so that the award would be finalized and protected against challenges in other courts.").

A motion to modify a joint, stipulated protective order does not present the same concerns.[6] Here, the parties negotiated the terms of the protective order more than five years ago and submitted the order for the

---

[5] As the Supreme Court put it, "violation of Rule 11 is *complete* when the paper is filed," and thus "a voluntary dismissal does not expunge the Rule 11 violation." *Cooter & Gell*, 496 U.S. at 395, 110 S. Ct. at 2455 (emphasis added) (quotation marks omitted).

[6] The dissent insists that we should conduct our "collateral issue" analysis under "the two factors we set out in" *Hyde v. Irish*, 962 F.3d 1306 (11th Cir. 2020)—that is, whether considering the motion to modify is both "constitutionally permissible" and "practically important." Dissenting Op. at 3–5. *Hyde* very loosely pulls these two "factors" from *Willy v. Coastal Corp.*, 503 U.S. 131, 112 S. Ct. 1076 (1992), which in turn relies on *Cooter & Gell*. But neither *Willy* nor *Cooter & Gell* state that determining whether an issue is collateral hinges on any two-step framework, nor does *Hyde* definitively state that we must always analyze "constitutional permissibility" and "practical importance" to decide the issue. *See Hyde*, 962 F.3d at 1309. Thus, it is unclear that we are required to walk through the two factors.

But assuming that we must follow *Hyde*'s analysis, we would still conclude that a motion to modify a protective order is not a "collateral issue." For the reasons described on pages 19 through 23 of this opinion, permitting post-voluntary-dismissal consideration of a motion to modify a protective order does not curb abuses of the judicial system—the policy behind Rule 41(a)(1)—and thus it is not practically important for the district court to hear the motion. *See Cooter & Gell*, 496 U.S. at 397, 110 S. Ct. at 2457.

18

District Court's approval. Devine knew at the time the order was negotiated that she was under investigation by Swiss authorities, and she could have pushed for a stipulation allowing her to use the Funds' confidential documents in her Swiss defense. Simply put, by voluntarily dismissing their case, the Funds did not somehow abuse the judicial process,[7] manipulate the protective order, or place Devine at any strategic disadvantage. To the contrary, the Fund's Rule 41(a)(1)(A)(i) dismissal frees up Devine's resources to fight legal battles on other fronts.

The District Court's lack of jurisdiction to consider the motion to modify does not harm the Funds, either. When denying Devine's efforts to modify the protective order, the District Court ordered Devine to comply with the terms of the protective order—that is, destroy or return the Funds' confidential documents—and ordered the Funds to retain copies of their documents "until the conclusion of the Swiss proceedings so that those materials will be available should the Swiss seek to obtain them." As a result, the Funds' confidential documents are no longer in Devine's possession and are instead being held by the clerk of court. This alleviates

---

[7] Devine contends that the Funds "funneled" her confidential documents to Swiss authorities during this case. The Funds deny that they funneled documents to any government authority without the District Court's express permission, and we see no evidence to support Devine's contention.

any concern that, by divesting the District Court of jurisdiction and vacating the Court's order, we would somehow allow Devine to simply run off with the Funds' confidential documents to defend herself in the Swiss proceedings.

But what if the District Court had correctly concluded, prior to enforcing the destroy-or-return requirement, that it no longer had jurisdiction over the matter? In that case, it is possible that Devine—still in possession of the Funds' confidential documents—could have used the documents she received pursuant to the protective order for her Swiss defense. There are a few solutions to this problem.

First, the Funds could have dismissed under Federal Rule of Civil Procedure 41(a)(2), rather than Rule 41(a)(1). Rule 41(a)(2) provides that "an action may be dismissed at the plaintiff's request only by court order, on terms that the court considers proper." Fed. R. Civ. P. 41(a)(2). Pursuant to that Rule, "the court has discretion to dismiss the case through an order and to specify the terms of that dismissal." *Anago Franchising*, 677 F.3d at 1276. It is clear, then, that the District Court could have conditioned a Rule 41(a)(2) voluntary dismissal on the parties' compliance with the protective order's destroy-or-return requirement.

Second, in the event a party attempts to use a voluntary dismissal as an opportunity to violate a protective order—here, the hypothetical in which Devine runs off with the Funds' documents following a Rule 41(a)(1)(A)(i) dismissal—the other party still has a remedy in the district court in which the protective order was filed. To state the obvious, protective orders are court orders, and district courts have the inherent power to impose sanctions for failure to comply with their orders. *See Kleiner v. First Nat'l Bank of Atlanta*, 751 F.2d 1193, 1209 (11th Cir. 1985) (stating that sanctions pursuant to court's inherent power are appropriate where attorney advises client to disregard a court order). Willful violation of a court order also raises the possibility of contempt sanctions. *See, e.g.*, *In re Se. Banking Corp.*, 204 F.3d 1322, 1332 (11th Cir. 2000) (stating that contempt sanctions are appropriate where an order with clear and specific terms is willfully violated). And as discussed above, both species[8] of sanctions can be considered when a district court lacks jurisdiction over the underlying case. *See Cooter & Gell*, 496 U.S. at 396, 110 S. Ct. at 2456 (discussing contempt sanctions); *Hyde*, 962 F.3d at 1310 (stating that sanctions can be considered

---

[8] As a reminder, "[s]anctions imposed for contempt of court are not . . . the same thing as sanctions imposed under the court's inherent power to police against bad faith conduct before it. Different rules apply to each." *Sciarretta v. Lincoln Nat'l. Life Ins. Co.*, 778 F.3d 1205, 1213 n.7 (11th Cir. 2015).

pursuant to district court's inherent authority even when the court lacks subject matter jurisdiction from the outset).  So, even if a district court is divested of jurisdiction over *some* issues following a Rule 41(a)(1)(A)(i) voluntary dismissal, litigants will not be free to run off and violate protective orders without facing the threat of sanctions.

Finally, in the context of a joint, stipulated protective order, there may be a third solution.  For the purposes of enforcement, we treat a stipulated order as though it is a contract.  *See United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238, 95 S. Ct. 926, 935 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract.").  Consequently, if a party wishes to enforce the terms of a stipulated protective order following a Rule 41(a)(1)(A)(i) dismissal in federal court, the party can take the stipulated protective order to a state court[9] of general jurisdiction and file a run-of-the-mill breach of contract claim.

*          *          *

In sum, the law provides that a district court has jurisdiction to consider only a small set of "collateral issues" following a plaintiff's voluntary dismissal of its case.  Those issues are, by this Court's read,

---

[9] Assuming the parties are of diverse citizenship and the amount in controversy exceeds $75,000, this hypothetical breach of contract claim could also be filed in federal court.  *See* 28 U.S.C. § 1332(a).

22

narrowly tailored to prevent "abuses of the judicial system" that would otherwise "burden[] courts and individuals alike with needless expense and delay." *Cooter & Gell*, 496 U.S. at 397–98, 110 S. Ct. at 2457. Motions to modify protective orders do not serve those same ends, and thus we decline to expand the set of "collateral issues" to cover them.[10]

## IV.

Because the Funds' Federal Rule of Civil Procedure 41(a)(1)(A)(i) voluntary dismissal deprived the District Court of jurisdiction over Devine's motion to modify the protective order, we vacate the District Court's order denying it.

**VACATED**.

---

[10] The dissent states that our conclusion "puts this Court out of step with our sister circuits" because "[e]very other circuit to consider this issue has approved of district courts exercising jurisdiction over motions like these, even after the underlying case had been resolved." Dissenting Op. at 4. But none of the cases the dissent cites for that proposition involve a Rule 41(a)(1)(A)(i) dismissal—the issue in *this case*. *See Poliquin v. Garden Way, Inc.*, 989 F.2d 527 (1st Cir. 1993) (case settled); *Gambale v. Deutsche Bank AG*, 377 F.3d 133 (2d Cir. 2004) (case settled and then dismissed pursuant to a Rule 41(a)(1)(A)(ii) stipulated dismissal); *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) (case settled); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424 (10th Cir. 1990) (case settled); *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (motion for permissive intervention into settled action "for the limited purpose of obtaining access to documents protected by a confidentiality order"). Instead, they discuss a district court's involvement after the parties have settled the case. *See, e.g., Gambale*, 377 F.3d at 139–42 (analyzing a stipulated dismissal pursuant to settlement). This is an important distinction, as district courts are often required to approve of—and may retain jurisdiction to enforce—settlement agreements.

GRANT, Circuit Judge, dissenting:

I agree that Susan Devine cannot prevail in her attempt to modify the protective order. But while the majority reaches that result by concluding that the district court lacked jurisdiction over her motion, I think that a motion to modify a protective order is exactly the sort of collateral issue that a district court may consider after voluntary dismissal. Because I believe the district court had jurisdiction over Devine's motion, I respectfully dissent.

I.

As the majority explains, a motion to dismiss under Federal Rule of Civil Procedure 41(a)(1) "strips the court of jurisdiction and leaves it without power to make legal determinations on the merits." *Anago Franchising, Inc. v. Shaz, LLC*, 677 F.3d 1272, 1275 (11th Cir. 2012). So when the hedge funds voluntarily dismissed their suit against Devine in February 2018, the district court lost jurisdiction to decide whether Devine was liable under the theories in their complaint—money laundering, unjust enrichment, RICO, and the like.

But even though the district court lost jurisdiction to consider the merits of this case, it retained the power to "decide certain 'collateral' issues related to the case." *Hyde v. Irish*, 962 F.3d 1306, 1309 (11th Cir. 2020) (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 395 (1990)). The Supreme Court recognized that principle in *Cooter & Gell v. Hartmarx Corp.*, when it found post-dismissal jurisdiction to impose Rule 11 sanctions. *See* 496 U.S. at 395. And it reaffirmed that holding two years later in *Willy v. Coastal Corp.*, 503 U.S. 131, 137–38 (1992). In the years since, this Circuit has applied those two cases and found

24

continuing jurisdiction over a variety of issues. *See, e.g.*, *Hyde*, 962 F.3d at 1310 (motion for 28 U.S.C. § 1927 sanctions); *PTA-FLA, Inc. v. ZTE USA, Inc.*, 844 F.3d 1299, 1308–09 (11th Cir. 2016) (motion to confirm an arbitral award); *United States v. Straub*, 508 F.3d 1003, 1008 (11th Cir. 2007) (charge of criminal contempt).

To decide whether a district court has continuing jurisdiction over an issue, we consider two criteria. First, we ask whether exercising jurisdiction over the issue is "constitutionally permissible." *Hyde*, 962 F.3d at 1309. And second, we ask whether it is "practically important." *Id.* Starting with "constitutionally permissible," we have said that deciding the issue must "not signify a district court's assessment" of the legal merits of the case. *Id.* (quoting *Willy*, 503 U.S. at 138). That's because doing so would mean that a court was considering a case or controversy, even when it lacked jurisdiction to do so. *Id.* But when a district court considers questions that are completely separate from the merits, it does not violate that constitutional limit.

As for practical importance, a key marker has been whether the ability (or inability) to consider a matter would have a serious impact outside the contours of a particular case. *Id.* at 1309–10. The "interest in having rules of procedure obeyed," for example, "outlives the merits of a case." *Id.* (quoting *Willy*, 503 U.S. at 139); *see also Straub*, 508 F.3d at 1009 ("The interest of the court in imposing punitive sanctions under Rule 11 does not disappear if the court lacks subject matter jurisdiction, because the court retains an interest in parties' obedience to its

25

authority.").  This point recognizes the institutional interests of courts, which cannot be left to the mercy of enterprising litigants.

A post-dismissal motion to modify a protective order satisfies both factors; it is both "constitutionally permissible" and "practically important" for district courts to hear that kind of motion.  *First*, it is "constitutionally permissible" because these motions typically present only collateral issues—that is, they have nothing to do with the merits.  *Hyde*, 962 F.3d at 1309.  The parties' arguments here illustrate that point.  In their extensive briefing, neither party relies—at all—on whether Devine is liable under the allegations in the Funds' complaint.  So the district court's power to consider a motion like this one does not involve it in the substantive issues of the case.

*Second*, practical importance.  It goes without saying that parties share sensitive information in reliance on both the protective order and the court's power to modify that order as necessary.  The federal courts' interest in maintaining control over discovery materials produced under protective orders extends far beyond any single action.  Similarly, the need to foster confidence that these orders will be appropriately enforced or modified "does not rise or fall with any particular case."  *Id.*  And though district courts have—at least—an indirect power to enforce protective orders after dismissal, that power must go hand in hand with the power to modify them.  After all, the scope of a protective order may lead to unanticipated consequences years after it was negotiated or entered.  Likewise, the district court may need to close a loophole that escaped its attention at the time the order was entered.  Modification, then, can sometimes be necessary to facilitate an

26

open discovery process and to serve the interests of confidentiality or fairness. Given all that, motions to modify protective orders fit neatly into the category of collateral issues that qualify for continuing jurisdiction under our analysis in *Hyde*.

The majority's contrary conclusion puts this Court out of step with our sister circuits. Every other circuit to consider this issue has approved of district courts exercising jurisdiction over motions like these, even after the underlying case had been resolved. Their reasoning has largely focused on a district court's inherent powers over this sort of continuing order—and those inherent powers are yet another reason we should tread carefully. The First Circuit explained that "a protective order, like any ongoing injunction, is always subject to the inherent power of the district court to relax or terminate the order, *even after judgment*." *Poliquin v. Garden Way, Inc.*, 989 F.2d 527, 535 (1st Cir. 1993) (emphasis added). Along similar lines, the Second Circuit found that a district court may modify a protective order even after a Rule 41 stipulation of dismissal was filed. *See Gambale v. Deutsche Bank AG*, 377 F.3d 133, 139–42 (2d Cir. 2004). The Third, Tenth, and D.C. Circuits have also found continuing jurisdiction to modify protective orders. *See Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 780 (3d Cir. 1994) (third parties can intervene to modify a protective order even after the underlying dispute has been settled); *United Nuclear Corp. v. Cranford Ins. Co.*, 905 F.2d 1424, 1427 (10th Cir. 1990) ("As long as a protective order remains in effect, the court that entered the order retains the power to modify it, even if the underlying suit has been dismissed."); *EEOC v. Nat'l Children's Ctr., Inc.*, 146 F.3d 1042, 1047 (D.C. Cir. 1998) (same).

The majority's analysis does not persuade me to break with the other circuits. To begin, I am not sure that the majority considers the two factors we set out in *Hyde*. And to the extent that it does, it condenses the "practically important" question down to whether divesting the district court of jurisdiction would allow opportunistic litigants to "abuse the judicial process." Maj. Op. at 19. That is more limited than what I read our precedents to support. But even if "practically important" were completely coextensive with "allows abuse of the judicial process," motions to modify protective orders would fit within that category. After all, the "enterprising plaintiff" who would Rule-41 his way out of sanctions could use the same move to quickly (and, apparently, permanently) lock in an advantageous protective order—perhaps one that allowed him to misuse documents in ways that were not obvious when the order was first issued.

Additionally, most of the majority's analysis centers on the facts of this case, rather than on whether exercising jurisdiction over motions to modify protective orders—as a general matter—satisfies *Hyde*'s two-factor framework. But the Supreme Court in *Cooter & Gell* did not focus on whether Cooter & Gell deserved Rule 11 sanctions. And in *Hyde*, we did not base our analysis on whether § 1927 sanctions were merited for George Hyde. The reasoning in those cases instead rested on whether exercising jurisdiction over such motions was constitutionally permissible and practically important as a general matter. That is the mode of analysis that we should undertake here.

The majority itself recognizes that its holding presents practical problems. Maj Op. at 20. For example, it observes that its holding could open the door for

28

Devine to use the documents she obtained under the protective order "for her Swiss defense" in violation of the protective order. Maj. Op. at 20. It offers several potential solutions, ranging from a different type of dismissal to state-court enforcement of the protective order. But those workarounds do not remedy the defects in its holding. *Id.* For starters, a jurisdictional rule that both ossifies protective orders and renders them only marginally enforceable—even while the parties still maintain copies of each other's documents—is in serious conflict with the judiciary's interest in maintaining a robust and fair discovery process in which litigants can rely on the court's supervision. But even on their own terms, the majority's case-by-case solutions offer only one-sided relief; they fail to protect the party that did *not* voluntarily dismiss the case.

For instance, the majority says that the dismissing party could choose to obtain an order of dismissal under Rule 41(a)(2), which allows the district court to retain control over its protective order. But this suggestion only aids the dismissing party—and it effectively gives that party complete control over whether the district court can modify its protective order, or perhaps even whether it can enforce it. A party seeking to lock in an advantageous protective order through dismissal would not take that route. Far from foreclosing abusive behavior, then, this proposed solution seems to *invite* it. And though a party that wishes to enforce a protective order may be able to do so by seeking contempt sanctions, today's holding leaves a party who discovers unanticipated consequences of the court's order but who is also unwilling to defy that order without any recourse.

29

The majority also points out that a party could enforce a protective order in state court as a contract. Maj. Op. at 22. That solution is incomplete at best. As the majority concedes, protective orders do not always represent an agreement between the parties—which means that the contract-enforcement solution will not always be available. But there is a larger issue: whatever else *state* courts can do, they cannot modify a *federal* protective order, no matter how necessary it becomes. So whatever limited ability litigants have to enforce a protective order under the majority's holding, they are completely barred from seeking modification.

In sum, a motion to modify a protective order is a collateral issue. It also implicates judicial interests apart from a single case. That means retaining jurisdiction over these orders after dismissal is both "constitutionally permissible" and "practically important." *Hyde*, 962 F.3d at 1309. I would hold that the district court has jurisdiction to consider Devine's request to modify.

II.

While I disagree with the majority's jurisdictional holding, I agree that Devine should not be able to modify the protective order at this point. Devine needed to show the district court "good cause" to modify the protective order. *Carrizosa v. Chiquita Brands Int'l, Inc.*, 965 F.3d 1238, 1250 (11th Cir. 2020). And we review the district court's decision on that issue for an abuse of discretion. *Id.* at 1249. After all, "[d]istrict courts are in a superior position to decide whether to enter or modify protective orders, and it is well established that 'the decision as to access is one best left to the sound discretion of the trial court.'" *FTC v. AbbVie*

30

*Prods. LLC*, 713 F.3d 54, 61 (11th Cir. 2013) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 599 (1978)).

To show that the district court abused its discretion when it denied her motion to modify, Devine raises her need for the Funds' documents, her alleged ignorance of the Swiss authorities' involvement in this case, and the classic umbrella of "equitable arguments." But the district court didn't ignore these arguments—it just did not think they added up to good cause for modification. I see no abuse of discretion in that decision.

Devine also asserts that she was fraudulently induced to enter the protective order, but this argument fares no better.[1] As the majority notes, Devine knew that she was under investigation by the Swiss authorities when she negotiated the protective order; she could have asked then for the relief she seeks now. And in any event, I see no evidence that the Funds made any false statements or otherwise misled Devine. She has not shown an abuse of discretion on this point either.

On these facts, it was always going to be difficult for Devine to show that the district court abused its considerable discretion. If we had reached the question, I would have found that Devine failed to do so.

\*       \*       \*

It is important for courts to act with restraint when it comes to subject matter jurisdiction. We are courts of limited jurisdiction, and I admire the majority's

---

[1] It is not entirely clear how Devine's fraudulent inducement claim fits into our good cause framework. But because she has not shown fraudulent inducement anyway, I leave that issue for another day.

commitment to that principle.  But I do not believe our jurisdiction is limited in the way the majority suggests.  I respectfully dissent.